## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

Guilford Specialty Group, Inc.         )
                                    )
               Plaintiff,       )
                                    )   Case No.: 3:25-cv-00569
v.                             )
                                  )   Date:   April 10, 2025
Kelly K. Wolfram,             )   Judge:
                                    )
               Defendant.     )
                                    )
                                    )

## <u>VERIFIED COMPLAINT</u>

Plaintiff Guilford Specialty Group, Inc. ("Guilford"), by and through its attorneys, brings this Verified Complaint against Defendant Kelly K. Wolfram ("Wolfram"), for a willful and intentional breach of her restrictive covenants.  Guilford alleges as follows:

## NATURE OF THE ACTION

1.     Guilford sells commercial property and casualty insurance policies on a non-admitted basis, nationwide.  Guilford writes both primary and excess insurance.  Guilford distributes these policies primarily through wholesale brokers and agents, with some of those brokers and agents being granted permission to bind coverage on Guilford's behalf, provided they do so within in certain Guilford-mandated parameters relating to premium and policy terms.

2.     Wolfram worked for Guilford from March of 2021 until March 17, 2025.  She most recently was the Senior Vice President and Head of Excess Casualty.  During her tenure, Wolfram interacted extensively with Guilford's wholesale brokers and agents.  She also had access to Guilford's confidential and trade secret information including but not limited to: (i) Guilford's business plans and strategies for 2025 and beyond; (ii) Guilford's underwriting strategies, including its proprietary approaches to setting premium, selecting risk, and Guilford's overall

profit/margins and profit margin goals;  (iii) which wholesale brokers and agents are most reliable and best suited to distribute or bind policies; and (iv) the renewal schedules for all of Guilford's policy holders.

3.      In 2024, in connection with a promotion to Senior Vice President and Head of Excess Casualty, Guilford required Wolfram to execute a Confidentiality and Intellectual Property Agreement with Certain Other Restrictive Covenants (the "Agreement"), which included confidential information, non-competition and non-solicitation covenants. (*See* Exhibit A.)

4.      Wolfram resigned, effective March 17, 2025, to accept a job with CM Vantage Specialty Insurance Company ("CM Vantage")—a direct competitor of Guilford.  Wolfram's role with CM Vantage overlaps with her role with Guilford—she is Senior Vice President of Non-Admitted Casualty, which includes CM Vantage's excess casualty and primary casualty insurance lines.

5.      CM Vantage has only been in business from 2015, and it appears that Wolfram has been hired to help CM Vantage expand and grow in the very marketplace that she worked in for Guilford.

6.      Wolfram initially tried to conceal this competing role from Guilford's leadership, claiming she would be joining a small, regional, mutual insurance company in Wisconsin that would reduce her need for travel.  But, she declined to disclose the specific entity and role.  And, after leaving, she did not update her LinkedIn profile to reflect her new position.  Because of this dishonesty, Guilford only learned that Wolfram had joined CM Vantage through market sources.

7.      Wolfram's position with CM Vantage violates her covenant to not, for a period of twelve months following termination of her employment with Guilford, be employed by any business that competes with Guilford and any of its affiliates for which Wolfram provided services

within any state where Wolfram provided such services in any capacity or role that is similar to the role Wolfram had with Guilford.

8. Therefore, Guilford brings claims of breach of contract and seeks both damages and equitable relief, including injunctive relief prohibiting Wolfram from continuing to violate her covenants.

## THE PARTIES

9. Guilford is a corporation organized under the laws of the state of Delaware with a principal place of business at 185 Asylum St., Hartford, CT 06103.

10. Wolfram is an individual domiciled in the state of Wisconsin, residing at 10718 47th Avenue, Pleasant Prairie, Wisconsin 53158. Wolfram was formerly the Senior Vice President and Head of Excess Casualty at Guilford.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the Parties are citizens of different states and the matter in controversy exceeds $75,000.00.

12. This Court has personal jurisdiction over Wolfram as she agreed to the following contractual forum selection and jurisdiction waiver in the Agreement:

> 8.2.2. Consent to Jurisdiction. EMPLOYEE HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT AND THAT OF THE SUPERIOR COURT OF THE STATE OF CONNECTICUT IN AND FOR HARTFORD COUNTY, CONNECTICUT, FOR ANY ACTION, PROCEEDING OR LITIGATION ARISING OUT OF THIS AGREEMENT, ANY ACTIONS CONTEMPLATED BY THIS AGREEMENT, ANY MATTERS RELATED TO EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR ANY TERMINATION OF SUCH EMPLOYMENT (COLLECTIVELY, **"*EMPLOYMENT LITIGATION*"**). EMPLOYEE AGREES NOT TO COMMENCE ANY EMPLOYMENT LITIGATION EXCEPT IN THE AFOREMENTIONED FEDERAL COURT OR, IF JURISDICTION DOES NOT

LIE THERE, THEN IN SUCH CONNECTICUT SUPERIOR COURT. EMPLOYEE FURTHER IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF ANY COURT CHOSEN BY THE COMPANY, IN ITS SOLE DISCRETION, FOR ANY EMPLOYMENT LITIGATION. EMPLOYEE FURTHER AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY U.S. REGISTERED MAIL TO EMPLOYEE SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY EMPLOYMENT LITIGATION BROUGHT AGAINST EMPLOYEE IN ANY COURT. EMPLOYEE HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY EMPLOYMENT LITIGATION IN THE COURT WHERE EMPLOYMENT LITIGATION IS COMMENCED IN ACCORDANCE WITH THIS SECTION 8.2.2. EMPLOYEE HEREBY IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY COURT WHERE ANY EMPLOYMENT LITIGATION IS BROUGHT, THAT EMPLOYMENT LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM OR RAISE ANY SIMILAR DEFENSE. **TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EMPLOYEE (I) AGREES THAT ANY TRIAL IN CONNECTION WITH ANY EMPLOYMENT LITIGATION SHALL BE EXCLUSIVELY BEFORE THE COURT WITHOUT A JURY AND (II) WAIVES ANY RIGHT EMPLOYEE MAY OTHERWISE HAVE TO TRIAL BY JURY ARISING OUT OF ANY EMPLOYMENT LITIGATION.**

(Exhibit A, § 8.2.2).

13.    This contractual forum selection and jurisdiction waiver referenced in Paragraph 12 was reasonably communicated to Wolfram where (i) Wolfram expressly warranted that she carefully read and understood all provisions of the Agreement and had full and sufficient time to consider the Agreement and seek the advice of counsel and (ii) Wolfram had previously signed a similar contractual forum selection and jurisdictional waiver in a similar confidentiality and intellectual property agreement with certain other restrictive covenants at the onset of her employment in 2021.

14.    This contractual forum selection and jurisdictional waiver referenced in Paragraph 12 is mandatory because, in addition to waiving objections to venue irrevocably, the contractual forum selection and jurisdictional waiver selects a forum.

15.     This contractual forum selection and jurisdictional waiver referenced in Paragraph 12 covers the claims involved in this dispute, namely Wolfram's breach of the Agreement.

16.     Enforcement of the contractual forum selection and jurisdictional waiver is not unreasonable or unjust where Guilford is headquartered in Connecticut with many of the witnesses and documents located in Connecticut, where Wolfram reported to superiors based in Connecticut, and where litigating in Connecticut does not impose a grave inconvenience.

17.     Venue is proper in the District of Connecticut because Wolfram agreed to submit to the venue of this Court and waive objections to venue here.

## FACTUAL ALLEGATIONS

### A.     Guilford's Business As A Provider of Non-Admitted Insurance Coverage

18.      Guilford is a holding company that owns a group of privately-owned, affiliated insurance companies known as IFG Companies.

19.     Guilford writes property and casualty insurance for businesses.  Guilford offers such insurance written on a non-admitted basis, which is a specialized segment of property and casualty insurance that provides coverage for unique or high-risk situations where standard insurance policies are unavailable or inadequate.

20.     Surplus lines or non-admitted insurance differs from "admitted" insurance.  When a carrier sells insurance on an admitted basis, the policy terms and the premium must conform to requirements set by the applicable state insurance departments.  In return, policyholders who purchase admitted insurance are protected by state guaranty funds in case of the carrier's insolvency.  Admitted polies are typically only available for more routine risks, and for insureds with good or clean claims history.

4

21.     Guilford sells both primary and excess coverage to businesses.  Primary insurance provides the initial layer of coverage, kicking in first to cover a claim, while excess insurance kicks in after the primary policy's limits are exhausted, providing additional coverage for the same claim. Excess insurance coverage is particularly useful for businesses that have significant assets or are engaged in higher risk activities such as construction or manufacturing.

22.     Guilford currently offers a maximum excess casualty limit of $5 million.

23.     Surplus lines or "non-admitted" insurance is typically sold through wholesale brokers and agents.  Wholesale brokers and agents operate as intermediaries between insured's retail brokers or agents and insurance carriers.  Typically, when an insured's retail broker or agent is unable to secure coverage through traditional means (*e.g.*, admitted policies), the retail broker or agent will send the parameters to wholesale brokers and agents, and request a quote.

24.     The wholesale brokers and agents will seek bids from those carriers the wholesaler believes might be interested in and able to provide the specific coverage.  If interested in and able to provide the specific coverage, the insurance carrier (like Guilford) will then submit a quote. The wholesaler will provide to the original retail agent the best quote that meets the insurance needs at the most efficient price.

25.     When Guilford and other carriers evaluate whether to offer coverage, under what terms, and how much premium should be charged, that decision is made by an individual underwriter.  The underwriter is usually directly employed by the carrier (here Guilford), who is making these decisions on an application-by-application basis.

26.     Guilford, however, has also granted certain wholesale brokers and agents bind authority.  That means, the wholesaler also employs underwriters who are given pre-approval to bind Guilford to coverage within certain parameters pre-approved by Guilford.

27.    Under either circumstance, good underwriting is the key to success.  That is because a carrier has to price insurance at a competitive rate while still ensuring sufficient premium to cover losses across the portfolio.  An overly aggressive underwriter who charges too little premium and/or gives too generous terms to ensure that their bid wins may sell a high number of policies but fail to cover the carrier's losses.  An overly conservative underwriter may demand high premiums and/or restrictive policy terms that are guaranteed to cover the carrier's losses, but no one will purchase the policy because they are not price and/or terms competitive.  The key is to get it just right.

28.    This task is more challenging for surplus lines or "non-admitted" insurance, which is inherently riskier and requires substantial underwriting judgment and discipline.

29.    Wholesalers are paid a commission on the premium collected on policies.  Unfortunately, some wholesale brokers and agents do not feel the same loyalty to the carrier as its directly employed underwriters.  As a result, sometimes underwriters employed by wholesalers bind or select a bid to secure a sale and carrier commission without regard to whether the sale is profitable to the carrier.

30.    Since 1985, Guilford has expended significant resources developing a comprehensive strategy to underwriting to ensure that it gets the formula just right.

31.    Over those decades, Guilford has also spent resources identifying and servicing the classes or types of businesses that provide the most profitable returns.

32.    Guilford further has developed underwriting criteria and approaches towards risk tolerance, management, and selection. To aid its efforts, Guilford also spent millions of dollars developing a proprietary information technology platform to assist its leaders (like Wolfram) and underwriters.

33.     Guilford has additionally spent considerable resources identifying the specific individual wholesale brokers and agents who are the most productive, best understand Guilford's approach to coverage, and have the greatest success rate in either brokering or binding insurance coverage at profitable rates and terms.

34.     In short, Guilford has forty years of experiences through trial-and-error and other analysis to ensure that it is able to write the most profitable business.

**B.     Wolfram's Relevant Work History And Agreements**

35.     Guilford hired Wolfram in March of 2021 as an Assistant Vice President for Excess Casualty.

36.     As a condition of her initial employment in 2021, Wolfram executed a confidentiality and intellectual property agreement with certain other restrictive covenants.  While Wolfram was permitted to work from home, she was part of Guilford's Chicago office and required to travel to Chicago multiple times a quarter.  Wolfram also travelled on business to other Guilford offices.

37.     Following Wolfram's promotion to Senior Vice President and Head of Excess Casualty, Wolfram continued to be part of Guilford's Chicago office, with required travel from her home office in Wisconsin to Chicago multiple times a quarter. Wolfram also travelled on business to other Guilford offices.

38.     As Senior Vice President and Head of Excess Casualty, Wolfram was part of Guilford's senior leadership team.  In this role, Wolfram led a large team of underwriters focused on Guilford's nationwide provision of excess casualty insurance.  Wolfram regularly interacted with the wholesalers that Guilford partnered with and from whom Guilford received requests for coverage quotes.

39.     But Wolfram's responsibilities went well beyond this "customer facing" role. Wolfram set and implemented the strategic direction of excess casualty, established priorities for underwriters reporting to her, and ensured those underwriters were writing business within Guilford's risk profile and risk appetite.

40.     Wolfram's specific responsibilities as Senior Vice President and Head of Excess Casualty included:

- Leading the development and execution of the excess casualty unit's and Guilford's annual financial plan;

- Driving the development of growth and profitability initiatives to achieve the excess casualty unit's financial targets for premiums and underwriting profit, as set forth in annual plan;

- Developing and managing strategies across the excess casualty unit that are intended to optimize attachment points, mix of business and the level of supported vs. unsupported business on a portfolio basis;

- Developing and managing renewal and target lists, as well as new business efforts;

- Collaborating with corporate underwriting, actuarial and claims units to ensure underwriting pricing and practices are updated for favorable or unfavorable emerging trends;

- Managing the excess casualty unit's compliance with Guilford's underwriting guidelines such as bind-to-quote ratios, premium by class, commission and loss ratios, etc.

- Holding and participating in frequent excess casualty unit management meetings wherein emerging trends, producer and competitor developments, renewal and target lists, and progress against new business and renewal goals were discussed;

- Retaining, developing and recruiting, as needed, highly qualified and well-trained underwriters;

- Establishing and actively participating in initiatives that enhance the excess casualty unit's relationships with wholesalers; and

- Managing the assignment of underwriters to optimize production, geographic coverage and profitability.

41.     Wolfram was also privy to Guilford's proprietary confidential information such as Guilford's underwriting criteria, Guilford's risk tolerance and risk selection, Guilford's class focus (such as business types that Guilford will target to provide insurance, that Guilford is neutral, mixed or positive about providing insurance to, and that Guilford will not provide insurance to), Guilford's pricing, Guilford's profit margins, Guilford's current and future rate increases, Guilford's confidential and proprietary reinsurance agreements, reinsurance structures and mix of reinsurers, as well as Guilford's approach to reinsurance strategy and partnerships, and Guilford's plans with respect to technology development.

42.     Wolfram also had access to and utilized Guilford's confidential information regarding which wholesale agents and brokers could most effectively and efficiently broker writing of given levels of risks at targeted levels of profitability.

43.     For instance, Wolfram participated in Guilford's regular broker and agent profitability reviews, which identified which brokers and agents were providing the best returns for Guilford, which in turn directed Guilford's focus to expanding relationships with those brokers and agents.

44.     Wolfram did not just have access to this confidential and proprietary information, she played a part in developing and utilizing it.

45. For example, Wolfram played a key part in developing Guilford's 2025 business plan (and strategies and plans beyond 2025), which included identification of specific class of business focus changes (*i.e.*, areas of the market that Guilford wanted to target or not target), Guilford's pricing and profit margin approach for the year, and Guilford's approach to rate increases for the year.

46. Although Wolfram's responsibilities were primarily related to excess coverage, Wolfram was charged with primary casualty oversight as well for a brief period of time.

47. More importantly, Guilford has a small leadership team that regularly collaborates across lines of business. Wolfram was regularly involved as a senior leadership team member in discussions regarding Guilford's strategy and approach to all of its casualty and property lines of insurance, including primary and excess casualty insurance and its reinsurance.

48. When Wolfram was promoted to Senior Vice President and Head of Excess Casualty, in April of 2024, her base salary increased to $270,000.00 per year and Wolfram would receive additional short term and long-term incentive compensation opportunities. (See Ex. B, Promotion Letter.)

49. As a condition to that promotion and additional compensation in 2024, Wolfram was required to execute the operative 2024 Agreement. (Ex. A.)

50. In Section 2.1 of the Agreement, Wolfram acknowledged that she had, and following her promotion would continue to have, access to Guilford's Confidential Information and further promised to not improperly use or disclose that Confidential Information:

> 2.1. Disclosure and Use Restrictions. Employee understands and acknowledges that, during Employee's employment with the Company and/or any of its Affiliates to date as an exempt employee, Employee has had, and following promotion will continue to have, access to Confidential Information in the normal course of employment and may have developed and, following promotion, also may develop Confidential Information in the course of providing services for the Company

and/or any of its Affiliates. All Confidential Information, Including all Confidential Information developed by Employee, shall, as between Employee and the Company and/or any of its Affiliates, remain at all times the sole and exclusive property of the Company and/or any of its Affiliates. Employee agrees to hold, throughout the Employment Period, all Confidential Information in strict trust and confidence for the Company. Further, Employee represents, warrants and agrees that throughout the Employment Period, Employee has not, and shall not hereafter, throughout the Employment Period, directly or indirectly, (a) disclose or disseminate any Confidential Information or (b) access, copy or use any Confidential Information, except, in each case, for the benefit of the Company Group in the normal course of properly performing Employee's regular duties as an employee of the Company or otherwise for the benefit of the Company Group with the express advance written approval of an Authorized Officer. Following the Employment Period, Employee shall not (i) at any time, directly or indirectly, disclose, disseminate, access, copy or use any Trade Secret and (ii) during the Post-Employment Non-Disclosure Restricted Period (defined in this Section 2.1., below), anywhere in the Post-Employment Non-Disclosure Territory (defined in this Section 2.1., below), directly or indirectly, disclose, disseminate, access, copy or use any Confidential Information, whether or not a Trade Secret, unless, in each case, the Employee has previously received express written authorization signed by an Authorized Officer. Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's services during the Employment Period shall be subject to the provisions and conditions of this Agreement as if the Company and/or any of its Affiliates had furnished the same Confidential Information to Employee in the first instance. Further, without limiting the generality of the previous sentences, and subject to the other provisions of this Agreement, Employee understands and agrees that Confidential Information is to be shared only on a need-to-know basis even within the Company or the Company Group; that Confidential Information is never to be left unattended where it may be seen by Customers or other visitors to the premises of the Company and/or any of its Affiliates (Including, for example, seen on a desk top or a computer monitor); and that, even on such premises, Confidential Information is not to be discussed in elevators, halls or any other place where Customers or other visitors to the premises of the Company and/or any of its Affiliates may overhear it. This Section 2.1., however, is not intended to restrict and does not restrict Employee from disseminating or using (i) information that is published or available to the general public (other than as a result of an improper or unauthorized disclosure by Employee or by any other Person that Employee knows, or reasonably should know, has a confidentiality obligation to the Company or any of its Affiliates), (ii) information that is obtained from a third party having the right to disclose such information without restriction, (iii) the knowledge and skills of a generalized nature, whether possessed by Employee prior to and outside of Employee's employment with the Company or acquired by Employee during Employee's employment with the Company or (iv) information the disclosure of which is expressly permitted by or otherwise subject to Section 2.4. of this Agreement. For purposes of this Agreement: (a) "*Post-Employment Non-Disclosure Restricted*

11

*Period*" means the twenty-four (24) month period that immediately follows the Termination Date; and (b) "*Post-Employment Non-Disclosure Territory*" means anywhere within the United States and any state, province or other geographic or political subdivision of any other country, in which, or as to which, the Company or any of the Served Affiliates (defined in Section 7.2., below) conducted business or otherwise operated or provided services at any time during the Employment Period.

(Ex. A, at § 2.1.)  The Agreement defined Confidential Information as:

(a) any and all information and materials, Including trade secrets, Arising Out Of the prior, current, contemplated or future business of the Company or any of its Affiliates that are of value to the Company and/or any of its Affiliates and that are not generally known by Persons with which the Company or any of its Affiliates competes or plans to compete and/or by Persons with which the Company or any of its Affiliates does business or plans to do business, Including information and materials Arising Out Of the prior, current, contemplated or future activities, operations, plans, Customers, suppliers, services, staffing, recruitment, methods, products, technology, software, negotiations, proposals, contracts, transactions, finances, assets or liabilities of the Company or any of its Affiliates (Including, in each case, the existence, status and any actual and proposed provisions thereof), (b) any and all information and materials of any Person, Including a Customer, supplier or licensor, with respect to which the Company or any of its Affiliates has any confidentiality obligation, (c) the Work Product (defined in this Section 1., below), (d) any and all passwords, network or systems login credentials, access protocols, security procedures, and other internal security and systems controls of the Company or any of its Affiliates and (e) any and all information or materials in whole or in part Arising Out Of any of the foregoing, Including notes, analyses, compilations, projections, studies or other information or materials prepared by, for or on behalf of Employee. Employee understands that the above list is not exhaustive and that Confidential Information also Includes other information and materials that are marked or otherwise identified (orally or in writing) as confidential or proprietary or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information or materials are known or used. Confidential Information Includes information and materials that may constitute "trade secrets" as that term is defined in the Wisconsin Uniform Trade Secrets Act, Wis. Stat. §134.90, as in effect from time to time (such Confidential Information, individually, a **"Trade Secret" and**, collectively, **"Trade Secrets"**). As of the effective date of this Agreement, Trade Secrets are defined in the Wisconsin Uniform Trade Secrets Act as "information . . . for which all of the following apply (i) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (ii) the information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances." Employee understands and agrees that Trade Secrets may Include information and

materials Arising Out Of the activities, operations, plans, Customers, suppliers, services, staffing, recruitment, methods, products, technology, software, negotiations, proposals, contracts, transactions, finances, assets and/or liabilities of the Company and/or any of its Affiliates (Including, in each case, the existence, status and any actual and proposed provisions thereof). All other information and materials falling within this Paragraph that are not Trade Secrets are nonetheless Confidential Information. Confidential Information may be in tangible form Including materials in hardcopy and information stored electronically (Including on a computer hard-drive, a flash drive, thumb drive or any other electronic equipment or on a computer network or system). Confidential Information also may be in intangible form, Including information that is learned by listening or observing or that is remembered. The term "Confidential Information" does not include information and materials that are or become public knowledge other than as a result of unauthorized use or disclosure by Employee or by any other Person that Employee knows, or reasonably should know, has a confidentiality obligation to the Company or any of its Affiliates; nor does it include information that is obtained from a third party having the right to disclose such information without restriction. The term "Confidential Information" also does not include knowledge and skills of a generalized nature, whether possessed by Employee prior to and outside of Employee's employment with the Company or acquired by Employee during Employee's employment with the Company.

(Ex. A, § 1.)

51.     Section 4.1 of the Agreement imposes obligations upon Wolfram to not, without authorization or as required by her job duties, modify, destroy, or delete Guilford's property including its documents and data:

4.1.1. Except as may be (a) required to properly perform Employee's obligations as an employee of the Company, (b) expressly authorized in writing in advance by an Authorized Officer or (c) otherwise expressly provided by this Agreement, Employee shall not, and Employee has no right or power to authorize any other Person to: use, access, disclose, deliver, sell, transfer, export, reproduce, modify, supplement (Including by adding any software or data, by combining with any other item or otherwise), prepare derivative works based upon, destroy, delete, remove from the premises of the Company Group or disrupt the operation, integrity or security of, any Company Items (defined in this Section 4.1.1., below) or Confidential Information (Including Work Product) or any portion of either of the foregoing. As used in this Agreement, the term "*Company Items*" means any and all materials, items, equipment, technology, facilities and other property owned, rented or leased by the Company or any other member of the Company Group provided or made available to Employee by any Company Related Person or otherwise, Including those produced by Employee, directly or indirectly in the course of Employee's employment or Employee performing services for the Company and/or its Affiliates or otherwise and those derived from any of the foregoing. Examples of Company Items Include Company-owned

13

or Company-provided computers, computer systems and related equipment, software, telephones and voice mail systems and other electronic equipment, websites (Including internet, extranet, intranet sites and social media sites), e-mail and instant messaging systems, document storage systems, storage equipment, digital media and hard drives, networking equipment, firewalls and encryption technologies and equipment, photocopying and scanning equipment, card keys, ID badges and other physical security equipment and access control systems, and passwords, login credentials and access codes. Employee shall not remove, and shall not permit the removal of, any notice, legend, identification, evidence or other marking concerning confidentiality, ownership or proprietary rights that are contained on or included in any Company Items or Confidential Information. Further, Employee represents and warrants that, throughout the time from the beginning of the Employment Period through the date Employee signs this Agreement, Employee has not engaged in any act or omission that would have violated any provision of this Section 4.1., had this Agreement been in effect during that time.

4.1.2. Further, Company Items (Including computer hardware and software, telephone and paging equipment, voice mail, text messaging, e-mail and other electronic equipment and systems) are provided for the conduct of the business of the Company Group and are not to be used for other purposes. Accordingly, Employee shall not store, process, transmit or otherwise access Employee's own information or materials on Company Items. Employee acknowledges and agrees that the Company Group shall have the right to regard and treat any information or materials that Employee may store, process, transmit or otherwise access using Company Items as the Company Group's sole and exclusive property, to be monitored, accessed, deleted, copied, disclosed or otherwise utilized as the Company Group shall in its sole discretion determine appropriate.

(Ex. A, § 4.1.)

52.    The Agreement included Wolfram's covenant to not, for a period of twelve months following the termination of Wolfram's employment, be employed by any business, including in insurance and/or reinsurance, that competes with the business of the Guilford or any of its affiliates to which Wolfram provided services to or obtained confidential information about within any state in which Wolfram provided services to the Guilford or those served affiliates, in any capacity or role that is similar to the roles Wolfram had with the Company:

7.2. Non-Competition After Employment Period. During the twelve (12) month period that immediately follows the Termination Date (the "*Post-Employment Restricted Period*"), regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise, Employee shall not, without the prior express written consent of the Company, signed by an Authorized Officer, directly or indirectly, anywhere in the Territory (defined in this Section 7.2.,

below), own, manage, operate or control (or participate in the ownership, management, operation or control of) a Competitive Business (defined in this Section 7.2., below) or, in a Related Capacity (defined in this Section 7.2., below) be employed by, or provide consulting, advisory or any other services, with or without compensation (whether in cash, equity or otherwise), to any Person engaged, or planning to engage, in a Competitive Business. Notwithstanding the foregoing, this Section 7.2. shall not preclude Employee from being an employee of, or from otherwise providing services to, a separate division or operating unit (a "*Division*") of a multi-divisional business or enterprise that is engaged in a Competitive Business (a "*Competitive Enterprise*") if the Division by which Employee is employed, or to which Employee provides services, is not engaged in a Competitive Business and Employee does not provide services, directly or indirectly, to any other division or operating unit of such Competitive Enterprise if such other division or operating unit is engaged in a Competitive Business. For purposes of this Agreement: (a) "*Competitive Business*" means any business, Including insurance and/or reinsurance, that competes within the Territory with any business in which the Company or any of the Served Affiliates was engaged, had in development or was planning to engage, at any time during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months); (b) "*Territory*" means any state within the United States and any state, province or other geographic or political subdivision of any other country, in which, or as to which, Employee provided services to the Company or any of the Served Affiliates at any time during the Employment Period; (c) "*Served Affiliates*" means (i) the Affiliates of the Company for which, or as to which, Employee provided services at any time during the Employment Period and (ii) the Affiliates of the Company for which, or as to which, Employee obtained or developed Confidential Information at any time during the Employment Period that would be of aid to Employee in directly or indirectly competing, or in directly or indirectly assisting any other Person to compete, with those Affiliates during the Post-Employment Restricted Period; and (d) "*Related Capacity*" means (i) any capacity or role related to, substantially similar to, or having duties or responsibilities similar to, the capacity(ies) or role(s) Employee holds or held, or in which Employee otherwise provides or provided services, for the Company and/or any of its Affiliates during the Employment Period or (ii) any other capacity or role in which the services to be provided by Employee would give the Competitive Business engaging Employee in such a capacity or role an unfair advantage over the Company or any other member of the Company Group as a result of Employee's access, during the Employment Period, to Confidential Information, to employees of the Company and/or its Affiliates, to Customers and other business relationships of the Company and/or its Affiliates and to the goodwill of the Company and/or its Affiliates with Customers and other business relationships.

(Ex. A, § 7.2.)

53.     Section 7.3.1 of the Agreement outlines Wolfram's to not solicit certain customers

post-employment:

 7.3.1. Non-Solicitation of Customers and Other Business Relationships. From the
effective date of this Agreement and continuing throughout the remainder of the
Employment Period and during the twenty-four (24) month period that immediately
follows the Termination Date (in the aggregate, the "*Customer Non-Solicitation
Period*"), regardless of the reason for termination and whether it is initiated by
Employee, the Company or otherwise, Employee shall not, without the prior express
written consent of the Company, signed by  an Authorized Officer, directly or
indirectly, Including by assisting, soliciting, persuading, encouraging or otherwise
inducing, or in any manner attempting to assist, solicit, persuade, encourage or
otherwise induce, any Person to: (a) assist, solicit, persuade, encourage or otherwise
induce, or in any manner attempt to assist, solicit, persuade, encourage or otherwise
induce, any Customer, reinsurer or supplier to discontinue or diminish its or their
relationship with the Company and/or any of its Affiliates; (b) assist, solicit,
persuade, encourage or otherwise induce, or in any manner attempt to assist, solicit,
persuade, encourage or otherwise induce, any Customer to conduct with any other
Person any business (Including any program competitive with any Program) that
such Customer conducts or could conduct with the Company and/or any of its
Affiliates; (c) assist, solicit, persuade, encourage or otherwise induce, or in any
manner attempt to assist, solicit, persuade, encourage or otherwise induce, any
reinsurer to conduct with any other Person any business that is competitive with any
Program as to which Employee provided to such reinsurer (or Employee is aware
that such reinsurer has received) Confidential Information or other business
information from the Company and/or any of its Affiliates; or (d) otherwise interfere
with or disrupt, or in any manner attempt to interfere with or disrupt, any of the
Company's and/or any of its Affiliates' relationships with any Customer, reinsurer
or supplier; provided, however, that Employee's obligations under this Section 7.3.1.
during that portion of the Customer Non-Solicitation Period that follows the
Termination Date shall apply only to those Customers, reinsurers and suppliers that
were doing business with the Company and/or any of its Affiliates at any time during
the last twelve (12) months of the Employment Period (or at any time during the
Employment Period, if the Employment Period is less than twelve (12) months) *and*
(i) with which Employee had material personal dealings or for which Employee was
responsible in a client management capacity during the last twelve (12) months of
the Employment Period (or at any time during the Employment Period, if the
Employment Period is less than twelve (12) months), (ii) with which someone under
Employee's direct supervision had material personal dealings or for which someone
under Employee's direct supervision was responsible in a client management
capacity during the last twelve (12) months of the Employment Period (or at any
time during the Employment Period, if the Employment Period is less than twelve
(12) months), *or* (iii) as to which Employee obtained or developed Confidential
Information or goodwill during the Employment Period that would assist Employee
in competing, or in assisting other Persons to compete, with the Company Group for

the business of such Customer, reinsurer or supplier. The Company, on the one hand, and Employee, on the other, expressly acknowledge and agree that this Section 7.3.1. in itself is not intended to, and will not, function as a covenant against competition.

(Ex. A, § 7.2.1.)

54.    Section 7.3.2 of the Agreement specifies Wolfram's commitment to not solicit

certain employees and service providers following her employment:

7.3.2. Non-Solicitation of Employees and Other Service Providers. From the effective date of this Agreement and continuing throughout the remainder of the Employment Period and during the twenty-four (24) month period that immediately follows the Termination Date (in the aggregate, the "*Employee Non-Solicitation Period*"), regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise, Employee shall not, without the prior express written consent of the Company, signed by an Authorized Officer, directly or indirectly (a) recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, or in any manner attempt to recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, or (b) assist, solicit, persuade, encourage or otherwise induce, or in any manner attempt to assist, solicit, persuade, encourage or otherwise induce, any Person to recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, or to in any manner attempt to recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, any individual providing services to the Company and/or any of its Affiliates, whether as an employee, consultant, independent contractor or otherwise, to (i) terminate or diminish, or in any manner attempt to terminate or diminish, such individual's employment or services to the Company and/or any of its Affiliates or (ii) accept employment or other service engagement with, or otherwise provide services to, or in any manner attempt to accept employment or other service engagement with, or otherwise provide services to, any Person other than the Company or any of its Affiliates. From the effective date of this Agreement and continuing throughout the remainder of the Employment Period, Employee's obligations under this Section 7.3.2. shall apply both with respect to those individuals who are employed by or otherwise providing services to the Company or any of its Affiliates and those individuals whose employment or services to the Company or its Affiliates terminate at any time during that period, regardless of the reason for such termination and whether it is initiated by the individual or by the Company or any of its Affiliates. During that portion of the Employee Non-Solicitation Period that follows the Termination Date, however, Employee's obligations under this Section 7.3.2. shall apply only with respect to those individuals who are hired or employed by or otherwise providing services to the Company and/or any of its Affiliates and those individuals who resign or otherwise cause their employment or services to terminate or be terminated at any time during the last twelve (12) months of the Employment Period or at any time during that

17

portion of the Employee Non-Solicitation Period that follows the Termination Date. During that portion of the Employee Non-Solicitation Period that follows the Termination Date, however, Employee shall not be restricted from soliciting or recruiting any former employee or former service provider of the Company and/or any of its Affiliates whose employment or services are terminated by the Company or such Affiliate due to a reorganization, restructuring or lack of work, provided that such solicitation or recruiting is done on behalf of a Person that is not a Competitive Business.

(Ex. A., § 7.3.2.)

55.     Section 7.4.1 of the Agreement requires Wolfram to give advance notice to Guilford of any new employment so that Guilford can determine whether Wolfram is in compliance with her restrictive covenants:

7.4.1. Throughout the Employment Period and continuing thereafter until the date on which Employee has satisfied all of Employee's obligations under Section 7.1., Section 7.2. and Section 7.3. of this Agreement, Employee shall give not less than fifteen (15) business days' advance written notice to the Company of each New Business Activity (defined in this Section 7.4.1., below) before Employee undertakes such New Business Activity, which written notice shall in each instance state the name and address of the Person for which or with which the New Business Activity is to be undertaken and an accurate and complete description of the New Business Activity, Including Employee's proposed business relationship(s), position(s), title(s), duties, responsibilities and start date in the New Business Activity. Employee shall provide the Company with such other relevant, non-privileged information concerning each New Business Activity as the Company may from time to time require in order to determine Employee's continued compliance with all obligations of Employee to the Company or any of its Affiliates that survive termination of employment, whether pursuant to this Agreement or otherwise. A **"New Business Activity"** means any employment, services as an independent contractor or other business service arrangement or any ownership (subject to the final sentence of Section 7.1. of this Agreement), whether through a sole proprietorship, partnership, corporation or any other form of business organization, regardless of whether such employment, other service arrangement or ownership is with or without compensation.

(Ex. A, § 7.4.1.)

56.     Section 7.4.2 of the Agreement requires Wolfram to give notice to her future employers of her obligations under the Agreement:

7.4.2. Further, Employee agrees that throughout the Employment Period and thereafter for so long as Employee has any obligations under this Agreement that are intended by their provisions to survive termination of Employee's employment, Employee shall give notice of Employee's obligations under this Agreement, and provide a copy of this Agreement, to each Person from which Employee directly or indirectly solicits a New Business Activity, each Person that directly or indirectly solicits Employee to engage in a New Business Activity, each Person from which Employee accepts employment or for which Employee otherwise agrees to provide services and each employment agency, employee recruiter and the like with which Employee deals while seeking, or being solicited for, employment or any other position as a service provider. Employee agrees that the Company and any of its Affiliates shall have the right to provide notice of Employee's obligations under this Agreement, orally and/or in writing and/or a copy of this Agreement to any Person that is an employee recruiter or the like; that is an employer or prospective employer of Employee; and any other Person that may engage Employee to provide services or that otherwise may engage with Employee in a New Business Activity. Employee agrees to defend, indemnify and hold all Company Related Persons harmless from any and all claims, costs and damages in any way Arising Out Of the Company or any of its Affiliates providing notice of Employee's obligations under this Agreement and/or a copy of this Agreement to any Person.

57.    Wolfram expressly acknowledged in the Agreement that the restrictive covenants included in the Agreement are necessary for the reasonable protection of Guilford's business relationships, goodwill, and confidential information, and that such restraints are reasonable in respect to subject matter and scope:

8.1.1. Acknowledgements by Employee. Employee represents and warrants that Employee has carefully read and considered and understands all of the provisions of this Agreement, Including the restraints imposed upon Employee. Employee agrees, without reservation, that each of the restraints contained in this Agreement is necessary for the reasonable protection of Customer relationships and other valuable business relationships and goodwill, Confidential Information and other legitimate interests of the Company Group and that each of those restraints is reasonable in respect to its subject matter and scope, length of time and geographic area. Further, recognizing that the Company will rely on the foregoing in granting Employee the promotion and salary increase to which reference is made in the Recitals of this Agreement (meaning those paragraphs that fall between the initial paragraph of this Agreement and Section 1. of this Agreement) as well as in continuing to employ Employee and in continuing to grant Employee access to Confidential Information and/or business relationships and goodwill, and intending that the Company should so rely, Employee agrees not to assert, and not to permit to be asserted on Employee's behalf, in any forum, any position inconsistent with any of the foregoing representations, warranties and agreements.

19

(Ex. A, § 8.1.2.)

58.    Wolfram also expressly acknowledged in the Agreement that, in the event of a

threatened breach or actual breach of the Agreement, the harm suffered would not be fully

compensable by money damages and thus the Company would be entitled to obtain, without

posting bond, injunctive relief, restraining orders, specific performance, and other equitable relief

that may be necessary:

> 8.1.2. Remedies. Employee acknowledges and agrees that, in the event of any threatened
> or actual breach of this Agreement by Employee, the Company and/or one or more of its
> Affiliates will suffer immediate and irreparable injury not compensable by money damages
> and for which they will not have an adequate remedy available at law. Accordingly,
> Employee agrees that, if the Company or any of its Affiliates institutes an action or
> proceeding to enforce the provisions of this Agreement, the Company and its Affiliates
> shall be entitled to obtain, without the posting of any bond or security, such injunctive
> relief, restraining orders, specific performance and other equitable relief as may be
> necessary or appropriate to prevent or curtail any such breach, threatened or actual. Any
> such equitable relief shall be in addition to, and not in lieu of, any other remedies to which
> the Company and its Affiliates may be entitled. Further, Employee agrees with the
> Company that no breach or claimed breach of this Agreement or of any other agreement
> between the Company and/or any of its Affiliates, on the one hand, and Employee, on the
> other, shall relieve Employee of any of Employee's obligations under this Agreement.

(Ex. A, § 8.1.2.)

59.    The Agreement expressly and exclusively selects Connecticut law as its governing

law. (Ex. A, § 8.2.1.)

60.    The Agreement expresses an intent that, should any part of the Agreement is found

to be illegal or unenforceable, the offending provisions do not affect the application of other

provisions and further that the offending provisions should be construed in a manner to permit

enforcement to the maximum intent possible:

> 8.4. Severability. The provisions of this Agreement are severable and, if any provision is
> declared illegal or unenforceable by a court of competent jurisdiction, such illegality or
> unenforceability shall not affect the enforceability of any other provision; nor shall such
> illegality or unenforceability affect the application of the provision in circumstances other

than those as to which it is declared illegal or unenforceable. In addition, if any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable as drafted by virtue of the nature or scope of restricted activities, temporal duration or geographic area thereof or otherwise, then such provision shall be construed in a manner to effectuate the purposes of such provision to the maximum extent enforceable.

(Ex. A, § 8.4.)

61.     Wolfram expressly represented and warranted that she read and understood the terms of the Agreement, and had time to consider the Agreement and seek legal advice:

8.7. Employee Assurances. In accepting this Agreement, Employee represents and warrants to the Company that Employee has carefully read and understands all of the provisions and conditions of this Agreement; that, in accepting this Agreement, Employee has relied only on the provisions and conditions of this Agreement and those of the Letter of Employment and on no other agreements, understandings, negotiations, discussions, representations, presentations, statements or promises, written or oral, express or implied, between the Company or any other Company Related Person and Employee; that Employee has had a full and sufficient time to consider this Agreement and to seek advice concerning it from legal counsel and any other Persons of Employee's choosing before signing; and that Employee's acceptance of this Agreement is made freely and voluntarily, without reservation, and with the express understanding that the Company intends to fully and vigorously enforce all provisions and conditions of this Agreement.

(Ex. A, § 8.7.)     Indeed, in her roles with Guilford, Wolfram regularly dealt with insurance contracts far more complex than the Agreement.

## C.     Wolfram's Accepts A Senior Leadership Role at CM Vantage, A Competitor

62.     Wolfram resigned her employment with Guilford on March 3, 2025, effective March 17, 2025.

63.     Upon information and belief, Wolfram had begun interviewing with CM Vantage months prior and accepted the position before resigning.  Wolfram did so even though she was still heavily involved in Guilford's strategic efforts and operations.

64.     Although Section 7.4.1 of the Agreement required Wolfram to give notice at least fifteen days (15) days in advance of any employment with details including but not limited to the

new employer, her position, her title, her duties and responsibilities, and the start date, Wolfram did not provide these specifics.

65.    Rather, Wolfram told Guilford that she was joining a small mutual insurance company in Wisconsin and was motivated to do so because the new position would not require the travel and regular trips that Wolfram had been making to Chicago. This was false and clearly intended to deceive.

66.    Through market sources and only by chance, Guilford learned that Wolfram had begun a new job with CM Vantage as its Senior Vice President of Non-Admitted Casualty (including excess and primary) on March 17, 2025, thereby competing with Guilford on many levels.

67.    CM Vantage is an insurance carrier that also underwrites property and casualty insurance for commercial lines (businesses).

68.    CM Vantage is part of the Church Mutual Family of Companies ("Church Mutual"). Church Mutual is a large insurance conglomerate—in fact, it is larger than Guilford and all of IFG Companies.

69.    Church Mutual originally focused on providing insurance for churches and non-profits. Church Mutual started CM Vantage in 2015 to diversify its customer base.

70.    Just like Guilford, CM Vantage specializes in underwriting surplus lines insurance written on a non-admitted basis.

71.    Just like Guilford, CM Vantages writes coverage in all fifty states and the District of Columbia; it is a nationwide carrier.

72.    Just like Guilford, CM Vantage offers a maximum excess casualty limit of $5 million.

73. CM Vantage also targets the very same business that Guilford insures.

74. Specifically, CM Vantage advertises that it insures the following types of businesses:

    a.  interior hotel/motel, restaurants, grocery stores, shopping centers, and retail stores.

    b.  remodeling contractors, flooring contractors, drywall contractors, carpentry contractors, artisan contractors, small-to-medium size general contractors, and light traffic road repair.

    c.  tool & die, non-critical auto parts, sporting goods, electrical products, food products, machine shops, and machine service, installation, and repair.

    d.  office buildings, retail, industrial, lessor's risks, medical offices, and vacant buildings.

    e.  warehouses, freight forwarding operations (no auto), and distributors.

Guilford insures those same types of business.

75. Just like Guilford, CM Vantage distributes their products through contracted wholesale brokers and agents on both a broker basis and a bind basis with the latter being a new channel that CM Vantage wants to utilized.

76. In fact, CM Vantage and Guilford utilize many of the same wholesalers including but not limited to RT/All Risks, AmWINS, CRC, Burns & Wilcox, Hull, Bass, RPS, and Brown & Riding.

**D.    Wolfram Is Unfairly Competing With Guilford In Violation Of The Agreement**

77. In her position at CM Vantage, Wolfram is responsible for all non-admitted casualty and property lines of business nationwide, including CM Vantage's excess and primary

casualty lines. As such, Wolfram will be competing directly with the vast majority of Guilford business.

78.    Upon information and belief, Wolfram was hired to help CM Vantage grow in the marketplace and take market share away from other excess casualty and primary casualty insurance companies including Guilford.

79.    Upon information and belief, Wolfram's responsibilities include: (i) assisting in the development and execution of CM Vantage's business plan, including excess casualty and primary casualty, (ii) setting price goals and target business classes for underwriting, (iii) undertaking initiatives to grow CM Vantage's business scale while maintaining acceptable levels of profitability, and (iv) directing teams of underwriters who, in turn and based on Wolfram's directions, manage relationships with wholesale brokers and agents.

80.    Wolfram's executive position with CM Vantage as its Senior Vice President and Head of Non-Admitted Casualty (including excess and primary) is a role that has duties and responsibilities similar to Wolfram's executive position with Guilford as its Senior Vice President and Head of Excess Casualty and directly competes with Guilford on multiple levels.

81.    Wolfram's executive position with CM Vantage as its Senior Vice President and Head of Non-Admitted Casualty (including excess and primary) is a role in which her services to CM Vantage gives CM Vantage a competitive advantage over Guilford because, to achieve CM Vantage's growth mandates and be successful in her position, Wolfram will inevitably rely upon the "playbook" developed by Guilford.

82.    During her tenure at Guilford, Wolfram regularly interacted with Guilford's wholesale brokers and agents.  While there are many wholesale brokers and agents, the number of large wholesalers with whom the surplus lines insurers routinely deal has shrunk as a result of

market consolidation in the last several years.  The major players include RT/All Risks, AmWINS, CRC, Burns & Wilcox, Hull, Bass, RPS, and Brown & Riding.

83.    Wolfram will now be competing directly with Guilford when these larger wholesalers solicit bids from both CM Vantage and Guilford.  But, Wolfram has the advantage of knowing Guilford's underwriting guidelines, profit margin expectations, and pricing model.  Thus, Wolfram is uniquely positioned to underbid Guilford in the niche space that both operate in.

84.    Wolfram also knows when Guilford's insureds policies are up for renewal, which enables her to proactively reach out to wholesale brokers and agents to begin the renewal process before any bidding begins.  Such "speed to quote" could allow CM Vantage to undercut Guilford and secure policies before Guilford even has an opportunity to quote.

85.    Additionally, CM Vantage has just recently begun binding operations. Wolfram can use her knowledge of which specific wholesale brokers and agents that Guilford has authorized to bind coverage to identify the most effective and profitable wholesale brokers without have to go through the 40 years of trial-and-error.  This would not only save CM Vantage significant opportunity costs but also would erode Guilford's relationships with those brokers and agents.

86.    Wolfram's intimate knowledge of which classes of business Guilford writes and targets, the profitability of those classes of business for Guilford, the terms of the coverage and the specific wholesalers used to broker or bind those classes of business can and would be used to help CM Vantage develop its targets, its pricing, and its lists of which agents and brokers are best suited to broker and bind its policies—saving CM Vantage many years and millions of dollars of trial-and-error costs.

87.    Wolfram's experience with and knowledge of Guilford's confidential and proprietary reinsurance agreements, reinsurance structures, and mix of reinsurers also can be used

to help CM Vantage (i) save on millions of dollars of expense through avoiding arbitrations between itself and reinsurers by using Guilford's unique and proprietary agreements, and (ii) target which reinsurers are most effective to do business with.  This can further erode Guilford's market advantage.

88.    Accordingly, upon learning that Guilford had begun working in this role, Guilford engaged counsel and sent Wolfram and CM Vantage cease and desist letters on March 25, 2025. (Exhibit C; Exhibit D.)  Each letter outlined Wolfram's contractual promises to Guilford and Wolfram's breach of those promises as CM Vantage's Senior Vice President and Head of Non-Admitted Casualty (including excess and primary). (*Id.*)  Each letter demanded that Wolfram and CM Vantage abide by those contractual promises. (*Id.*)

89.    On March 28, 2025, counsel for CM Vantage and Wolfram responded that neither would honor Wolfram's non-competition obligations and Wolfram would remain in her role as Senior Vice President and Head of Non-Admitted Casualty (including excess and primary).

90.    At the request of CM Vantage and Wolfram, on April 2, 2025 and continuing on April 4, 2025, the Parties held a conference to determine if there could be appropriate safeguards put in place that would allow Wolfram to work for CM Vantage in the role of Senior Vice President and Head of Non-Admitted Casualty (including excess and primary) while not infringing upon Guilford's legitimate business interests.   This conference was unsuccessful.

91.    As of the date of filing, Wolfram remains CM Vantage's Senior Vice President and Head of Non-Admitted Casualty (including excess and primary).

**E.    Wolfram Engages In Highly Suspect Conduct In her Last Week**

92.    Upon learning of Wolfram's new employment, Guilford began reviewing Wolfram's computer use prior to her termination.  This review is ongoing.

93.     Guilford has now learned through its review of Wolfram's computer use that on March 7, 2025—just days before she would return her laptop and after she gave notice of resignation, Wolfram deleted 3,188 files from her Virtual Desktop Interface ("VDI").  The next day Wolfram deleted 1,162 files from her VDI.

94.      The VDI is a technology that allows users to interact with a virtualized desktop environment as if it was the desktop environment on the actual computer, but with the actual desktop and applications hosted on a central server.

95.     The deletion of over four thousand files was not authorized by Guilford and not part of Wolfram's duties.

96.     The deletion of over four thousand files went far beyond removal of personal files inadvertently stored on Guilford's systems; the deletions included files related to Guilford's business operations.

97.     The deletion of over four thousand files was a violation of Section 4.1 of the Agreement.

98.     Upon information and belief, Wolfram engaged in this activity to cover up use the irregular use and/or downloading of files related to Guilford's business operations.

## CLAIMS FOR RELIEF

### Count I: Breach Of Contract – Section 7.2 of the Agreement

99.     Guilford repeats and re-alleges Paragraph 1-104 as if fully set forth herein.

100.    The Agreement is a valid, binding, and fully enforceable contract under Connecticut law.

101.    Guilford fully performed all of its obligations under the Agreement.

102.    Under Section 7.2. of the Agreement, Wolfram promised to not, for a period of twelve months following the termination of Wolfram's employment, be employed by any business that competes with the business of the Guilford or any of its affiliates to which Wolfram provided services to or obtained confidential information about within any state in which Wolfram provided services to the Guilford or those served affiliates, in any capacity or role that is similar to the roles Wolfram had with the Company:

> 7.2. Non-Competition After Employment Period. During the twelve (12) month period that immediately follows the Termination Date (the "*Post-Employment Restricted Period*"), regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise, Employee shall not, without the prior express written consent of the Company, signed by an Authorized Officer, directly or indirectly, anywhere in the Territory (defined in this Section 7.2., below), own, manage, operate or control (or participate in the ownership, management, operation or control of) a Competitive Business (defined in this Section 7.2., below) or, in a Related Capacity (defined in this Section 7.2., below) be employed by, or provide consulting, advisory or any other services, with or without compensation (whether in cash, equity or otherwise), to any Person engaged, or planning to engage, in a Competitive Business. Notwithstanding the foregoing, this Section 7.2. shall not preclude Employee from being an employee of, or from otherwise providing services to, a separate division or operating unit (a "*Division*") of a multi-divisional business or enterprise that is engaged in a Competitive Business (a "*Competitive Enterprise*") if the Division by which Employee is employed, or to which Employee provides services, is not engaged in a Competitive Business and Employee does not provide services, directly or indirectly, to any other division or operating unit of such Competitive Enterprise if such other division or operating unit is engaged in a Competitive Business. For purposes of this Agreement: (a) "*Competitive Business*" means any business, Including insurance and/or reinsurance, that competes within the Territory with any business in which the Company or any of the Served Affiliates was engaged, had in development or was planning to engage, at any time during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months); (b) "*Territory*" means any state within the United States and any state, province or other geographic or political subdivision of any other country, in which, or as to which, Employee provided services to the Company or any of the Served Affiliates at any time during the Employment Period; (c) "*Served Affiliates*" means (i) the Affiliates of the Company for which, or as to which, Employee provided services at any time during the Employment Period and (ii) the Affiliates of the Company for which, or as to which, Employee obtained or developed Confidential Information at any time during the Employment Period that would be of aid to Employee in directly or

indirectly competing, or in directly or indirectly assisting any other Person to compete, with those Affiliates during the Post-Employment Restricted Period; and (d) "*Related Capacity*" means (i) any capacity or role related to, substantially similar to, or having duties or responsibilities similar to, the capacity(ies) or role(s) Employee holds or held, or in which Employee otherwise provides or provided services, for the Company and/or any of its Affiliates during the Employment Period or (ii) any other capacity or role in which the services to be provided by Employee would give the Competitive Business engaging Employee in such a capacity or role an unfair advantage over the Company or any other member of the Company Group as a result of Employee's access, during the Employment Period, to Confidential Information, to employees of the Company and/or its Affiliates, to Customers and other business relationships of the Company and/or its Affiliates and to the goodwill of the Company and/or its Affiliates with Customers and other business relationships.

(Ex. A, § 7.2.)

103.    This non-competition covenant in Section 7.2 of the Agreement is reasonable in (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests.

104.    With respect to length of time, the non-competition covenant in Section 7.2 of the Agreement is reasonable where it extends for only twelve months after the termination of employment.   This one-year restriction is tailored to the length of time that the confidential information Wolfram was exposed to has its most pertinent value.

105.    With respect to geographic area covered, the non-competition covenant in Section 7.2 of the Agreement is reasonable where it covers only those areas where Wolfram specifically provided services to Guilford or any of its affiliates upon whose behalf she conducted business or had confidential information about.   This geographic restriction does not extend to places where Guilford or the affiliates upon whose behalf Wolfram conducted business or had confidential information about did not do business or even areas where Guilford and those affiliates did

business that Wolfram was not involved in; rather, the geographic restriction is tailored to Wolfram specifically.

106.    With respect to the fairness of protection offered to Guilford, the non-competition covenant in Section 7.2 of the Agreement is reasonable because, in addition to being reasonably tailored in time and geographic scope, the covenant is focused on restraining Wolfram from being employed in a role similar to the role Wolfram had at Guilford as Senior Vice President and Head of Excess Casualty and further is focused only on Guilford and those affiliates that Wolfram herself provided services to or had confidential information about.  These restraints are necessary where Wolfram, as an executive at Guilford with intimate knowledge of Guilford's business, strategy, and confidential information, could unfairly use that knowledge on behalf of a competitor if she is in a similar role.

107.    With respect to the restraint on Wolfram's opportunity to pursue her occupation, the covenant is reasonable as it does not prohibit Wolfram from working in the insurance industry writ large and does not prohibit Wolfram from taking any job whatsoever with a competitive business (i.e., complying with the "janitor rule").  Rather, the restraint is tailored just to those positions where Wolfram can cause harm to Guilford.  For example, Wolfram can work for an insurance carrier that provides admitted coverage—such as Allstate, Chubb, Travelers, Liberty Mutual, State Farm and more (there are almost 4,000 admitted carriers)—in roles that utilize similar skill sets without being in breach of her covenant.  The covenant further does not indefinitely restrict Wolfram, who received significant and high compensation from Guilford in exchange for the covenant.

108.    With respect to the public good, the covenant does not deprive the public of essential goods and services because it applies only to Wolfram in a very specific area of insurance and does not prohibit CM Vantage or others from competing with Guilford.

109.    Wolfram's employment with CM Vantage as Senior Vice President of Non-Admitted Casualty (including excess and primary) is in breach of Section 7.2. of the Agreement. Specifically, CM Vantage is a business that competes with Guilford and Wolfram's role has duties and responsibilities similar to her role at Guilford.

110.    As a result of Wolfram's breach, Guilford has been damaged.

WHEREFORE, Guilford seeks judgment in its favor on Count I and all damages that may be proved at trial, its attorneys fees and costs, and any other relief this Court deems necessary and just.

## Count II: Injunctive Relief

111.    Guilford repeats and re-alleges Paragraph 1-103 as if fully set forth herein.

112.    The Agreement is a valid, binding, and fully enforceable contract under Connecticut law.

113.    Guilford fully performed all of its obligations under the Agreement.

114.    Under Section 7.2. of the Agreement, Wolfram promised to not, for a period of twelve months following the termination of Wolfram's employment, be employed by any business, including in insurance and/or reinsurance, that competes with the business of the Guilford or any of its affiliates to which Wolfram provided services to or obtained confidential information about within any state in which Wolfram provided services to the Guilford or those served affiliates, in any capacity or role that is similar to the roles Wolfram had with the Guilford:

7.2. Non-Competition After Employment Period. During the twelve (12) month period that immediately follows the Termination Date (the "*Post-Employment*

31

*Restricted Period*"), regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise, Employee shall not, without the prior express written consent of the Company, signed by an Authorized Officer, directly or indirectly, anywhere in the Territory (defined in this Section 7.2., below), own, manage, operate or control (or participate in the ownership, management, operation or control of) a Competitive Business (defined in this Section 7.2., below) or, in a Related Capacity (defined in this Section 7.2., below) be employed by, or provide consulting, advisory or any other services, with or without compensation (whether in cash, equity or otherwise), to any Person engaged, or planning to engage, in a Competitive Business. Notwithstanding the foregoing, this Section 7.2. shall not preclude Employee from being an employee of, or from otherwise providing services to, a separate division or operating unit (a "*Division*") of a multi-divisional business or enterprise that is engaged in a Competitive Business (a "*Competitive Enterprise*") if the Division by which Employee is employed, or to which Employee provides services, is not engaged in a Competitive Business and Employee does not provide services, directly or indirectly, to any other division or operating unit of such Competitive Enterprise if such other division or operating unit is engaged in a Competitive Business. For purposes of this Agreement: (a) "*Competitive Business*" means any business, Including insurance and/or reinsurance, that competes within the Territory with any business in which the Company or any of the Served Affiliates was engaged, had in development or was planning to engage, at any time during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months); (b) "*Territory*" means any state within the United States and any state, province or other geographic or political subdivision of any other country, in which, or as to which, Employee provided services to the Company or any of the Served Affiliates at any time during the Employment Period; (c) "*Served Affiliates*" means (i) the Affiliates of the Company for which, or as to which, Employee provided services at any time during the Employment Period and (ii) the Affiliates of the Company for which, or as to which, Employee obtained or developed Confidential Information at any time during the Employment Period that would be of aid to Employee in directly or indirectly competing, or in directly or indirectly assisting any other Person to compete, with those Affiliates during the Post-Employment Restricted Period; and (d) "*Related Capacity*" means (i) any capacity or role related to, substantially similar to, or having duties or responsibilities similar to, the capacity(ies) or role(s) Employee holds or held, or in which Employee otherwise provides or provided services, for the Company and/or any of its Affiliates during the Employment Period or (ii) any other capacity or role in which the services to be provided by Employee would give the Competitive Business engaging Employee in such a capacity or role an unfair advantage over the Company or any other member of the Company Group as a result of Employee's access, during the Employment Period, to Confidential Information, to employees of the Company and/or its Affiliates, to Customers and other business relationships of the Company and/or its Affiliates and to the goodwill of the Company and/or its Affiliates with Customers and other business relationships.

(Ex. A, § 7.2.)

115.    This non-competition covenant in Section 7.2 of the Agreement is reasonable in (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests.

116.    With respect to length of time, the non-competition covenant in Section 7.2 of the Agreement is reasonable where it extends for only twelve months after the termination of employment.  This twelve month restriction is tailored to the length of time that the confidential information Wolfram was exposed to has its most pertinent value.

117.    With respect to geographic area covered, the non-competition covenant in Section 7.2 of the Agreement is reasonable where it covers only those areas where Wolfram specifically provided services to Guilford or any of its affiliates upon whose behalf she conducted business or had confidential information about.  This geographic restriction does not extend to places where Guilford or the affiliates upon whose behalf Wolfram conducted business or had confidential information about did not do business or even areas where Guilford and those affiliates did business that Wolfram was not involved in; rather, the geographic restriction is tailored to Wolfram specifically.

118.    With respect to the fairness of protection offered to Guilford, the non-competition covenant in Section 7.2 of the Agreement is reasonable because, in addition to being reasonably tailored in time and geographic scope, the covenant is focused on restraining Wolfram from being employed in a role similar to the role Wolfram had at Guilford as Senior Vice President and Head of Excess Casualty and further is focused only on Guilford and those affiliates that Wolfram herself provided services to or had confidential information about.  These restraints are necessary where

Wolfram, as a senior executive at Guilford with intimate knowledge of Guilford's business, strategy, and confidential information, could unfairly use that knowledge on behalf of a competitor if she is in a similar role.

119. With respect to the restraint on Wolfram's opportunity to pursue her occupation, the covenant is reasonable as it does not prohibit Wolfram from working in the insurance industry writ large and does not prohibit Wolfram from taking any job whatsoever with a competitive business (i.e., complying with the "janitor rule"). Rather, the restraint is tailored just to those positions where Wolfram can cause harm to Guilford. For example, Wolfram can work for an insurance carrier that provides admitted coverage—such as Allstate, Chubb, Travelers, Liberty Mutual, State Farm and more (there are almost 4,000 admitted carriers)—in roles that utilize similar skill sets without being in breach of her covenant. The covenant further does not indefinitely restrict Wolfram, who received significant and high compensation from Guilford in exchange for the covenant (and would have continued to receive raises and bonuses if she stayed).

120. With respect to the public good, the covenant does not deprive the public of essential goods and services because it applies only to Wolfram in a very specific area of insurance and does not prohibit CM Vantage or others from competing with Guilford.

121. Wolfram's employment with CM Vantage as Senior Vice President of Non-Admitted Casualty (including excess and primary) is in breach of Section 7.2. of the Agreement. Specifically, CM Vantage is a business that competes with Guilford and Wolfram's role has duties and responsibilities similar to her role at Guilford.

122. As a proximate and foreseeable result of Wolfram's breaches of Section 7.2 of the Agreement, Guilford has suffered and will continue to suffer harm to its legitimate business

interests, including its good will, confidential and proprietary information, and business and employee relationships.

123.    Guilford has no adequate remedy at law to the disruption of its legitimate business interests, including its good will, confidential and proprietary information, and business and employee relationship, because once those interests are disrupted, there is little to no chance to restoring them.    Further, because of the nature of Guilford's business involving the sale of insurance products through brokers and agents that act independently, it is not a simple matter of calculating revenue lost from clients who might change their insurance policies from Guilford to CM Vantage but rather also includes lost opportunities from those brokers and agents.

124.    The balance of equities favors the entry of an injunction requiring Wolfram to abide by her contractual promise to not compete.    Moreover, Guilford has consistently required individuals that it has determined to hire to comply with their restrictive covenants from their prior employers and paid those individuals while sitting out the length of their covenants; where Church Mutual is a substantial organization, there is no reason that Church Mutual cannot do the same.

WHEREFORE, Guilford seeks judgment in its favor on Count II and a permanent injunction order that Wolfram abide by Section 7.2 of the Agreement, as well as preliminary and temporary injunctive relief in the interim, its attorneys fees and costs, and any other relief this Court deems necessary and just.

### Count III: Breach Of Contract – Section 4.1 of the Agreement

125.    Guilford repeats and re-alleges Paragraph 1-103 as if fully set forth herein.

126.    The Agreement is a valid, binding, and fully enforceable contract under Connecticut law.

127.    Guilford fully performed all of its obligations under the Agreement.

128.    Under Section 4.1 of the Agreement imposes obligations upon Wolfram to not, without authorization or as required by her job duties, modify, destroy, or delete Guilford's property including its documents and data:

4.1.1. Except as may be (a) required to properly perform Employee's obligations as an employee of the Company, (b) expressly authorized in writing in advance by an Authorized Officer or (c) otherwise expressly provided by this Agreement, Employee shall not, and Employee has no right or power to authorize any other Person to: use, access, disclose, deliver, sell, transfer, export, reproduce, modify, supplement (Including by adding any software or data, by combining with any other item or otherwise), prepare derivative works based upon, destroy, delete, remove from the premises of the Company Group or disrupt the operation, integrity or security of, any Company Items (defined in this Section 4.1.1., below) or Confidential Information (Including Work Product) or any portion of either of the foregoing. As used in this Agreement, the term "*Company Items*" means any and all materials, items, equipment, technology, facilities and other property owned, rented or leased by the Company or any other member of the Company Group provided or made available to Employee by any Company Related Person or otherwise, Including those produced by Employee, directly or indirectly in the course of Employee's employment or Employee performing services for the Company and/or its Affiliates or otherwise and those derived from any of the foregoing. Examples of Company Items Include Company-owned or Company-provided computers, computer systems and related equipment, software, telephones and voice mail systems and other electronic equipment, websites (Including internet, extranet, intranet sites and social media sites), e-mail and instant messaging systems, document storage systems, storage equipment, digital media and hard drives, networking equipment, firewalls and encryption technologies and equipment, photocopying and scanning equipment, card keys, ID badges and other physical security equipment and access control systems, and passwords, login credentials and access codes. Employee shall not remove, and shall not permit the removal of, any notice, legend, identification, evidence or other marking concerning confidentiality, ownership or proprietary rights that are contained on or included in any Company Items or Confidential Information. Further, Employee represents and warrants that, throughout the time from the beginning of the Employment Period through the date Employee signs this Agreement, Employee has not engaged in any act or omission that would have violated any provision of this Section 4.1., had this Agreement been in effect during that time.

4.1.2. Further, Company Items (Including computer hardware and software, telephone and paging equipment, voice mail, text messaging, e-mail and other electronic equipment and systems) are provided for the conduct of the business of the Company Group and are not to be used for other purposes. Accordingly, Employee shall not store, process, transmit or otherwise access Employee's own information or materials on Company Items. Employee acknowledges and agrees that the Company Group shall have the right to regard and treat any information or materials that Employee may store, process, transmit or otherwise access using Company Items as the Company Group's sole and exclusive property, to be

36

monitored, accessed, deleted, copied, disclosed or otherwise utilized as the Company Group shall in its sole discretion determine appropriate.

(Ex. A, § 4.1.)

129.   Wolfram breached Section 4.1 when, on March 7, 2025 and March 8, 2025, Wolfram deleted over four thousand files from the VDI interface where such actions were neither authorized nor necessary to fulfill her obligations to Guilford.

130.   As a result of Wolfram's breach, Guilford has been damaged, including where Guilford has had to undertake the expense and effort to recover those files that Wolfram deleted.

WHEREFORE, Guilford seeks judgment in its favor on Count III and all damages that may be proved at trial, its attorneys fees and costs, and any other relief this Court deems necessary and just.

### Count IV: Breach of Contract – Breach of Section 7.4.1 of the Agreement

131.   Guilford repeats and re-alleges Paragraph 1-103 as if fully set forth herein.

132.   The Agreement is a valid, binding, and fully enforceable contract under Connecticut law.

133.   Guilford fully performed all of its obligations under the Agreement.

134.   Under Section 7.4.1 of the Agreement imposes obligations upon Wolfram to provide certain information to Guilford regarding any new job for a specified period of time so that Guilford can ensure compliance of its restrictive covenants.

7.4.1. Throughout the Employment Period and continuing thereafter until the date on which Employee has satisfied all of Employee's obligations under Section 7.1., Section 7.2. and Section 7.3. of this Agreement, Employee shall give not less than fifteen (15) business days' advance written notice to the Company of each New Business Activity (defined in this Section 7.4.1., below) before Employee undertakes such New Business Activity, which written notice shall in each instance state the name and address of the Person for which or with which the New Business Activity is to be undertaken and an accurate and complete description of the New Business Activity, Including Employee's proposed business relationship(s),

position(s), title(s), duties, responsibilities and start date in the New Business Activity. Employee shall provide the Company with such other relevant, non-privileged information concerning each New Business Activity as the Company may from time to time require in order to determine Employee's continued compliance with all obligations of Employee to the Company or any of its Affiliates that survive termination of employment, whether pursuant to this Agreement or otherwise. A **"*New Business Activity*"** means any employment, services as an independent contractor or other business service arrangement or any ownership (subject to the final sentence of Section 7.1. of this Agreement), whether through a sole proprietorship, partnership, corporation or any other form of business organization, regardless of whether such employment, other service arrangement or ownership is with or without compensation.

(Ex. A, § 7.4.1.)

135.    Wolfram breached Section 7.4.1 by not providing notice to Guilford as required regarding her position at CM Vantage.

136.    As a result of Wolfram's breach, Guilford has been damaged, including expenses incurred in retaining counsel, investigating Wolfram's position at CM Vantage, and tendering cease and desist letters.

WHEREFORE, Guilford seeks judgment in its favor on Count IV and all damages that may be proved at trial, its attorneys fees and costs, and any other relief this Court deems necessary and just.

.

Dated: April 10, 2025                    Respectfully submitted,


By:      /s/ *Brett Boskiewicz*
         _____
         Brett Boskiewicz (ct25632)
         **MCDERMOTT WILL & EMERY LLP**
         200 Clarendon Street, Floor 58
         Boston, MA 02116
         Tele: +1 617 535 4000
         Fax: +1 617 535 3800


         Rachel Cowen (*pro hac vice* forthcoming)
         Barrick Bollman (*pro hac vice* forthcoming)
         **MCDERMOTT WILL & EMERY LLP**
         444 West Lake Street
         Chicago, IL 60606-0029
         Tele:  +1 312 372 2000
         Fax: +1 312 984 7700

## VERIFICATION

I, Robert Linton, am the Chairman of Guilford Specialty Group, Inc.  I declare, under the penalty of perjury under the laws of the United States of America that, except for those allegations made upon information and belief, the factual allegations in the Verified Complaint are true and correct to the best of my knowledge and belief.  This verification is made after investigation into the details of Kelly Wolfram's role with Guilford (including my interactions with her as her ultimate supervisor), the details of Kelly Wolfram's actions with respect to her computer access and activity following her resignation, and into the details of Kelly Wolfram's role with CM Vantage.

Executed on this 10th day of April, 2025

DocuSigned by:

*Robert Linton*

178DB87FDC75427...

1