# EXHIBIT D



**mwe.com**

Rachel Cowen
Attorney at Law
rcowen@mwe.com
+1 312 984 6944

March 25, 2025

VIA OVERNIGHT MAIL

Pam Rushing
President, CMVantage
44 E. Mifflin St., Ste. 700
Madison, WI 53703

Re:    Kelly Wolfram

Dear Pam:

This letter is written on behalf of Guilford Specialty Group (together, with its affiliates and subsidiaries, "Guilford" or the "Company"). The Company is the former employer of Kelly Wolfram, where she most recently served as Senior Vice President, Head of Excess Casualty. Ms. Wolfram executed agreements with the Company that contain certain restrictive covenants. Please see the attached correspondence to Ms. Wolfram regarding those covenants, which Ms. Wolfram was required to provide CMVantage (or any other prospective employer) notice of and copies of.

The Company understands that Ms. Wolfram has joined CMVantage as the Senior Vice President of Non-Admitted Casualty and Property. The Company further understands that Ms. Wolfram began working for CMVantage on March 17, 2025. March 17, 2025 was Ms. Wolfram's final day of employment with the Company and a day on which she was paid by the Company and still owed the Company a duty of loyalty.

As you well know, CMVantage is a direct competitor with the Company for non-admitted casualty and property lines coverage nationwide. It is apparent that, as Senior Vice President of Non-Admitted Casualty and Property at CMVantage, Ms. Wolfram will be doing the exact same work she did for the Company, heading a team of underwriters to provide qualifying coverage nationwide.

If so, this is in violation of Ms. Wolfram's covenant to not, for a period of twelve months following the termination of her employment, be employed by any business, including in insurance and/or reinsurance, that competes with the business of the Company or any of its affiliates to which she provided services to or obtained confidential information about within any state in which she provided services to the Company or those affiliates, in any capacity or role that is similar to the roles she had with the Company. Enforcement of this non-competition covenant is necessary to protect the Company's legitimate business interests arising from its confidential information and trade secrets, as well as its relationships with producers, customers, and employees where, as here, Ms. Wolfram has taken a job with the exact same type of role that she had with the Company at one of the Company's direct competitors.



**444 West Lake Street   Chicago IL 60606-0029   Tel +1 312 372 2000   Fax +1 312 984 7700**

*US practice conducted through McDermott Will & Emery LLP.*

Kelly Wolfram
March 25, 2025
Page 2

Accordingly, the Company has demanded that Ms. Wolfram cease and desist her breach, and resign her employment with CMVantage by **6:00pm CT** on **Friday, March 28.**

To the extent Ms. Wolfram does not voluntarily resign, CMVantage must terminate her employment and provide confirmation to me in writing vie email that it has done so by **6:00pm CT** on **Friday, March 28**. Should CMVantage continue to employ Ms. Wolfram, the Company will view such employment as knowing tortious interference with its contracts and seek all legal and equitable remedies.

In addition to the non-competition covenant, Ms. Wolfram also agreed to other restrictions and requirements including but not limited to those which are summarized here and set forth more fully in the Appendix to the correspondence to Ms. Wolfram:

1. Ms. Wolfram cannot use or disclose the Company's confidential information for a period of twenty-four months following the date of termination;

2. Ms. Wolfram cannot use or disclose the Company's trade secrets in perpetuity;

3. Ms. Wolfram was required to return all Company property and confidential information in her possession;

4. Ms. Wolfram cannot, for a period of twenty-four months following the date of termination, indirectly or directly, solicit the Company's customers that did business with the Company and with which she had personal dealings, were responsible for client management for, directly supervised persons with personal dealings or client management responsibility, or had confidential information about during the last twelve months;

5. Ms. Wolfram cannot, for a period of twenty-four months following the date of termination, indirectly or directly, solicit or employ the Company's employees, consultants, or contractors;

6. Ms. Wolfram is required to notify any potential employer of her restrictive covenant obligations; and

7. Ms. Wolfram is required to not-disparage the Company or of its Affiliates, any of their products or services or any of their respective shareholders, directors or officers.

In order for the Company to further evaluate Ms. Wolfram's conduct, please provide the following to me in writing via email by **6:00pm CT** on **Friday, March 28**:

- The title, description, reporting structure, and all duties and responsibilities for Ms. Wolfram's position at CMVantage;

- A list of all specific measures CMVantage has taken to ensure that Ms. Wolfram is in compliance with the terms of her Guilford agreements, including the specific measures CMVantage has taken to ensure that Ms. Wolfram is not soliciting the Company's customers or employees, is not in possession of the Company's confidential information, and did not share or use any of the Company's confidential information and trade secrets on behalf of CMVantage;

Kelly Wolfram
March 25, 2025
Page 3

- A list of all current or former Company wholesale and/or retail insurance producers (i.e., agents and/or brokers), clients, client representatives, prospective clients, or business partners with whom Ms. Wolfram has had contacts or communications on behalf of CMVantage. For each identified, disclose the nature of those contacts or communications;

- A list of all of current or former Company employees, consultants, or independent contractors with whom Ms. Wolfram has had contacts or communications on behalf of CMVantage regarding employment at CMVantage. For each identified, disclose the nature of those contacts or communications;

- Confirmation of whether Ms. Wolfram provided or did not provide CMVantage notice of her restrictive covenant obligations and a copy of her Confidentiality And Intellectual Property Agreement with Certain Other Restricted Covenants with the Company dated April 15, 2024;

- A signed copy of the enclosed affirmation stating that CMVantage does not possess any of the Company's confidential information or property. If CMVantage does possess the Company's confidential information or property, you must contact me for instructions.

In addition, CMVantage is directed to preserve and protect all evidence of communications relating to the Company and Kelly Wolfram, including all emails, voicemails, text messages, instant messages, and any other written or electronic record. Failure to do so will be considered the deliberate spoliation of evidence, which may result in an adverse inference against you during legal proceedings.

This letter is written without waiver of, or prejudice to, any of the Company's rights in these matters (including related to its discovery of any additional misconduct), and the Company expressly reserves all of its rights in connection with these and any related matters.

Sincerely,


Rachel Cowen

## **<u>AFFIRMATION</u>**

I, Pam Rushing, hereby affirm the following on behalf of CMVantage:

1. CMVantage has not retained any of Guilford Specialty Group's (together, with its affiliates, the "Company") Confidential Information (as defined in Kelly Wolfram's Confidentiality And Intellectual Property Agreement with Certain Other Restricted Covenants with Guilford dated April 15, 2024) related to its hire of Kelly Wolfram or from Kelly Wolfram.

2. Ms. Wolfram has not disclosed any of the Company's Confidential Information (as defined in Kelly Wolfram's Confidentiality And Intellectual Property Agreement with Certain Other Restricted Covenants with Guilford dated April 15, 2024) to any employees, officers, directors, contractors, or consultants of CMVantage.

3. Ms. Wolfram has not solicited any of the Company's customers or employees on behalf of CMVantage.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Pam Rushing

_____

Date

**mwe.com**

Rachel Cowen
Attorney at Law
rcowen@mwe.com
+1 312 984 6944

March 25, 2025

VIA EMAIL AND OVERNIGHT MAIL

Kelly K. Wolfram
10718 47th Avenue
Pleasant Prairie, WI 53158
wolframkelly@yahoo.com

Re:    Your Continuing Obligations to Guilford Specialty Group

Dear Kelly:

This letter is written on behalf of Guilford Specialty Group (together, with its affiliates and subsidiaries, "Guilford" or the "Company").

Since April 15, 2024, you were Senior Vice President, Head of Excess Casualty at the Company.  In this position, you led a large team of underwriters to execute the strategic and operational plans of the Company's national Excess Casualty Unit.  Through this work, as well as in prior roles as Regional Vice President and Assistant Vice President in the Excess Casualty Unit, you were exposed to the Company's confidential and trade secret information.  You further were positioned by the Company to develop and maintain relationships with the Company's wholesale producers and customers, as well as the Company's employees.  As part of your employment with the Company, you agreed to various protective covenants necessary to the Company's legitimate business interests.  These covenants were a condition to the employment, promotions, and significant compensation you received.

You provided notice of your resignation on March 3, 2025, with your last date of employment on March 17, 2025.  At the time of your resignation, you conveyed that you were taking a position with a small mutual insurance company in Wisconsin and were motivated to do so because the new position would not require nationwide travel and the occasional trips you had been making to the Company's Chicago office.

The Company has since learned that this was not true.  Instead, the Company has been informed that you have joined CMVantage, a subsidiary of Church Mutual Insurance Company, and have begun work as Senior Vice President of Non-Admitted Casualty and Property.  The Company further understands you began working for CMVantage on March 17, 2025, which was the final day of your employment with the Company and on which you were paid by the Company and owed the Company a duty of loyalty.

As you well know, CMVantage is a direct competitor with the Company for non-admitted casualty and property lines coverage nationwide.  It is apparent that, as Senior Vice President of Non-Admitted Casualty and Property at CMVantage, you are doing the exact same work you did for the Company, heading a team of underwriters to provide qualifying coverage nationwide.



444 West Lake Street  Chicago IL 60606-0029  Tel +1 312 372 2000  Fax +1 312 984 7700
*US practice conducted through McDermott Will & Emery LLP.*

Kelly Wolfram
March 25, 2025
Page 2

Employment with CMVantage as Senior Vice President of Non-Admitted Casualty and Property violates your covenant to not, for a period of twelve months following the termination of your employment, be employed by any business, including in insurance and/or reinsurance, that competes with the business of the Company or any of its affiliates to which you provided services to or obtained confidential information about within any state in which you provided services to the Company or those affiliates, in any capacity or role that is similar to the roles you had with the Company. Enforcement of this non-competition covenant is necessary to protect the Company's legitimate business interests arising from its confidential information and trade secrets, as well as its relationships with producers, customers, and employees where, as here, you have taken a job with the exact same type of role that you had with the Company at one of the Company's direct competitors.

Breach of this non-competition covenant entitles the Company to seek injunctive relief requiring you to honor your twelve-month non-competition promise, as well as monetary damages, relief regarding your incentive awards, and the Company's attorneys' fees through an applicable court of law. To prevent such litigation, you are hereby directed to resign your employment and provide confirmation to me in writing via email that you have done so by **6:00pm CT** on **Friday, March 28**.

In addition to this non-competition covenant, you also agreed to the other restrictions and requirements, including but not limited to those which are summarized here and set forth in more detail in the Appendix:

1. You cannot use or disclose the Company's confidential information for a period of twenty-four months following the date of termination;

2. You cannot use or disclose the Company's trade secrets in perpetuity;

3. You are required to return all Company property and confidential information in your possession;

4. You cannot, for a period of twenty-four months following the date of termination, indirectly or directly, solicit the Company's customers that did business with the Company and with which you had personal dealings, were responsible for client management for, directly supervised persons with personal dealings or client management responsibility, or had confidential information about during the last twelve months;

5. You cannot, for a period of twenty-four months following the date of termination, indirectly or directly, solicit or employ the Company's employees, consultants, or contractors;

6. You are required to notify any potential employer of your restrictive covenant obligations; and

7. You are required to not-disparage the Company or of its Affiliates, any of their products or services or any of their respective shareholders, directors or officers.

In order for the Company to further evaluate your conduct with respect to these obligations, you must provide the following to me in writing via email by **6:00pm CT** on **Friday, March 28**:



Kelly Wolfram
March 25, 2025
Page 3

- A list of all current or former Company wholesale and/or retail insurance producers (i.e., agents and/or brokers), clients, client representatives, prospective clients, or business partners with whom you've had have contacts or communications either since your employment with the Company ended or about CMVantage, regardless of whether you had yet resigned from the Company or not. For each identified, disclose the nature of those contacts or communications;

- A list of all of current or former Company employees, consultants, or independent contractors with whom you've had contacts or communications regarding employment at CMVantage since your relationship with the Company ended or about CMVantage regardless of whether you yet had resigned from the Company or not. For each identified, disclose the nature of those contacts or communications;

- Confirmation of whether you provided or did not provide CMVantage notice of your restrictive covenant obligations and your Confidentiality And Intellectual Property Agreement with Certain Other Restricted Covenants with the Company dated April 15, 2024;

- A signed copy of the enclosed affirmation stating that you do not possess any of the Company's confidential information or property. If you do possess the Company's confidential information or property, you must contact me for instructions.

It is also apparent that you violated two other contractual obligations to the Company.

*First*, you were required to provide the Company with fifteen days' written notice of your new employment, stating the nature of the business relationship, position, titles, duties, responsibilities, and start date for the role. You did not provide such notice regarding your role with CMVantage. Accordingly, by **6:00pm CT** on **Friday, March 28**, provide to me in writing via email an itemization of duties and responsibilities for the Senior Vice President role at CMVantage, as well as your start date. You are on notice that you further must abide by this notice provision for any future employment or business service relationship for the next twelve months.

*Second*, you agreed that, absent authorization or as required by your obligations as an employee, you would not modify, destroy, delete, or remove Company property, including that on the Company's computer systems. While the Company's investigation is ongoing, the Company has uncovered evidence that you attempted to mass delete certain Company files prior to your termination.

In light of the above-stated misconduct, you are directed to preserve and protect all evidence of communications relating to the Company, its employees, wholesale producers, customers, clients, and business partners, including all emails, voicemails, text messages, instant messages, and any other written or electronic record. Failure to do so will be considered the deliberate spoliation of evidence, which may result in an adverse inference against you during legal proceedings.

You must comply with these requirements and those in your agreements with the Company. This letter is written without waiver of, or prejudice to, any of the Company's rights in these matters (including



Kelly Wolfram
March 25, 2025
Page 4

related to its discovery of any additional misconduct), and the Company expressly reserves all of its rights in connection with these and any related matters.

Sincerely,

*Rachel Cowen*

Rachel Cowen



## APPENDIX: RELEVANT AGREEMENT LANGUAGE

*Certain Definitions*:

**"Arising Out Of"** means arising out of, in connection with or in any way related to.

**"Company Group"** means the Company and its Affiliates.

**"Company Related Persons"** means the Company and its Affiliates and all of their respective shareholders, directors, officers, employees, agents, contractors, consultants, attorneys and other representatives. A **"Company Related Person"** means any one of the foregoing.

**"Confidential Information"** means (a) any and all information and materials, Including trade secrets, Arising Out Of the prior, current, contemplated or future business of the Company or any of its Affiliates that are of value to the Company and/or any of its Affiliates and that are not generally known by Persons with which the Company or any of its Affiliates competes or plans to compete and/or by Persons with which the Company or any of its Affiliates does business or plans to do business, Including information and materials Arising Out Of the prior, current, contemplated or future activities, operations, plans, Customers, suppliers, services, staffing, recruitment, methods, products, technology, software, negotiations, proposals, contracts, transactions, finances, assets or liabilities of the Company or any of its Affiliates (Including, in each case, the existence, status and any actual and proposed provisions thereof), (b) any and all information and materials of any Person, Including a Customer, supplier or licensor, with respect to which the Company or any of its Affiliates has any confidentiality obligation, (c) the Work Product (defined in this Section 1., below), (d) any and all passwords, network or systems login credentials, access protocols, security procedures, and other internal security and systems controls of the Company or any of its Affiliates and (e) any and all information or materials in whole or in part Arising Out Of any of the foregoing, Including notes, analyses, compilations, projections, studies or other information or materials prepared by, for or on behalf of Employee. Employee understands that the above list is not exhaustive and that Confidential Information also Includes other information and materials that are marked or otherwise identified (orally or in writing) as confidential or proprietary or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information or materials are known or used. Confidential Information Includes information and materials that may constitute "trade secrets" as that term is defined in the Wisconsin Uniform Trade Secrets Act, Wis. Stat. §134.90, as in effect from time to time (such Confidential Information, individually, a **"Trade Secret" and**, collectively, **"Trade Secrets"**). As of the effective date of this Agreement, Trade Secrets are defined in the Wisconsin Uniform Trade Secrets Act as "information . . . for which all of the following apply (i) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (ii) the information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances." Employee understands and agrees that Trade Secrets may Include information and materials Arising Out Of the activities, operations, plans, Customers, suppliers, services, staffing, recruitment, methods, products, technology, software, negotiations, proposals, contracts, transactions, finances, assets and/or liabilities of the Company and/or any of its Affiliates (Including, in each case, the existence, status and any actual and proposed provisions thereof). All other information and materials falling within this Paragraph that are not Trade Secrets are nonetheless Confidential Information. Confidential Information may be in tangible

form Including materials in hardcopy and information stored electronically (Including on a computer hard-drive, a flash drive, thumb drive or any other electronic equipment or on a computer network or system). Confidential Information also may be in intangible form, Including information that is learned by listening or observing or that is remembered. The term "Confidential Information" does not include information and materials that are or become public knowledge other than as a result of unauthorized use or disclosure by Employee or by any other Person that Employee knows, or reasonably should know, has a confidentiality obligation to the Company or any of its Affiliates; nor does it include information that is obtained from a third party having the right to disclose such information without restriction. The term "Confidential Information" also does not include knowledge and skills of a generalized nature, whether possessed by Employee prior to and outside of Employee's employment with the Company or acquired by Employee during Employee's employment with the Company.

**"Customers"** means (a) those Persons generally referred to in the insurance and reinsurance industry as wholesalers, brokers, producers, agents, general agents, managing general agents, managing general underwriters, program administrators and the like (**"Producers"**) which do business with the Company and/or any of its Affiliates (and, with respect to any Producer that is a corporation, limited liability company or other legal entity, such Producer shall be understood to include (i) the entity itself and (ii) all of its Affiliates that do, or have done, business with the Company or any of its Affiliates in one or more of the aforementioned capacities), (b) Program Groups (described within Program in this Section 1., below) and the Persons within those Program Groups, (c) insureds and reinsureds of the Company and/or any of its Affiliates, and (d) any and all other Persons to which the Company and/or any of its Affiliates directly or indirectly sell their products and services.

**"Employment Period"** means, in the aggregate, the period during which Employee is employed by the Company and any contiguous periods in which Employee is employed by any of its Affiliates or any of its or their successors or assigns from Employee's most recent date of hire through the date that Employee's employment terminates (regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise).

**"Termination Date"** means the last day of the Employment Period.

*Confidentiality and Non-Disclosure.*

2.1. Disclosure and Use Restrictions. Employee understands and acknowledges that, during Employee's employment with the Company and/or any of its Affiliates to date as an exempt employee, Employee has had, and following promotion will continue to have, access to Confidential Information in the normal course of employment and may have developed and, following promotion, also may develop Confidential Information in the course of providing services for the Company and/or any of its Affiliates. All Confidential Information, Including all Confidential Information developed by Employee, shall, as between Employee and the Company and/or any of its Affiliates, remain at all times the sole and exclusive property of the Company and/or any of its Affiliates. Employee agrees to hold, throughout the Employment Period, all Confidential Information in strict trust and confidence for the Company. Further, Employee represents, warrants and agrees that throughout the Employment Period, Employee has not, and shall not hereafter, throughout the Employment Period, directly or indirectly, (a) disclose or disseminate any Confidential Information or (b) access, copy or use any Confidential Information,

except, in each case, for the benefit of the Company Group in the normal course of properly performing Employee's regular duties as an employee of the Company or otherwise for the benefit of the Company Group with the express advance written approval of an Authorized Officer. Following the Employment Period, Employee shall not (i) at any time, directly or indirectly, disclose, disseminate, access, copy or use any Trade Secret and (ii) during the Post-Employment Non-Disclosure Restricted Period (defined in this Section 2.1., below), anywhere in the Post-Employment Non-Disclosure Territory (defined in this Section 2.1., below), directly or indirectly, disclose, disseminate, access, copy or use any Confidential Information, whether or not a Trade Secret, unless, in each case, the Employee has previously received express written authorization signed by an Authorized Officer. Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's services during the Employment Period shall be subject to the provisions and conditions of this Agreement as if the Company and/or any of its Affiliates had furnished the same Confidential Information to Employee in the first instance. Further, without limiting the generality of the previous sentences, and subject to the other provisions of this Agreement, Employee understands and agrees that Confidential Information is to be shared only on a need-to-know basis even within the Company or the Company Group; that Confidential Information is never to be left unattended where it may be seen by Customers or other visitors to the premises of the Company and/or any of its Affiliates (Including, for example, seen on a desk top or a computer monitor); and that, even on such premises, Confidential Information is not to be discussed in elevators, halls or any other place where Customers or other visitors to the premises of the Company and/or any of its Affiliates may overhear it. This Section 2.1., however, is not intended to restrict and does not restrict Employee from disseminating or using (i) information that is published or available to the general public (other than as a result of an improper or unauthorized disclosure by Employee or by any other Person that Employee knows, or reasonably should know, has a confidentiality obligation to the Company or any of its Affiliates), (ii) information that is obtained from a third party having the right to disclose such information without restriction, (iii) the knowledge and skills of a generalized nature, whether possessed by Employee prior to and outside of Employee's employment with the Company or acquired by Employee during Employee's employment with the Company or (iv) information the disclosure of which is expressly permitted by or otherwise subject to Section 2.4. of this Agreement. For purposes of this Agreement: (a) "*Post-Employment Non-Disclosure Restricted Period*" means the twenty-four (24) month period that immediately follows the Termination Date; and (b) "*Post-Employment Non-Disclosure Territory*" means anywhere within the United States and any state, province or other geographic or political subdivision of any other country, in which, or as to which, the Company or any of the Served Affiliates (defined in Section 7.2., below) conducted business or otherwise operated or provided services at any time during the Employment Period.

### *Company Items*.

4.1.1. Except as may be (a) required to properly perform Employee's obligations as an employee of the Company, (b) expressly authorized in writing in advance by an Authorized Officer or (c) otherwise expressly provided by this Agreement, Employee shall not, and Employee has no right or power to authorize any other Person to: use, access, disclose, deliver, sell, transfer, export, reproduce, modify, supplement (Including by adding any software or data, by combining with any other item or otherwise), prepare derivative works based upon, destroy, delete, remove from the premises of the Company Group or disrupt the operation, integrity or security of, any Company Items (defined in this Section 4.1.1., below) or Confidential Information (Including Work Product) or any portion of either of the foregoing. As used in this Agreement, the term "*Company Items*"

means any and all materials, items, equipment, technology, facilities and other property owned, rented or leased by the Company or any other member of the Company Group provided or made available to Employee by any Company Related Person or otherwise, Including those produced by Employee, directly or indirectly in the course of Employee's employment or Employee performing services for the Company and/or its Affiliates or otherwise and those derived from any of the foregoing. Examples of Company Items Include Company-owned or Company-provided computers, computer systems and related equipment, software, telephones and voice mail systems and other electronic equipment, websites (Including internet, extranet, intranet sites and social media sites), e-mail and instant messaging systems, document storage systems, storage equipment, digital media and hard drives, networking equipment, firewalls and encryption technologies and equipment, photocopying and scanning equipment, card keys, ID badges and other physical security equipment and access control systems, and passwords, login credentials and access codes. Employee shall not remove, and shall not permit the removal of, any notice, legend, identification, evidence or other marking concerning confidentiality, ownership or proprietary rights that are contained on or included in any Company Items or Confidential Information. Further, Employee represents and warrants that, throughout the time from the beginning of the Employment Period through the date Employee signs this Agreement, Employee has not engaged in any act or omission that would have violated any provision of this Section 4.1., had this Agreement been in effect during that time.

4.1.2. Further, Company Items (Including computer hardware and software, telephone and paging equipment, voice mail, text messaging, e-mail and other electronic equipment and systems) are provided for the conduct of the business of the Company Group and are not to be used for other purposes. Accordingly, Employee shall not store, process, transmit or otherwise access Employee's own information or materials on Company Items. Employee acknowledges and agrees that the Company Group shall have the right to regard and treat any information or materials that Employee may store, process, transmit or otherwise access using Company Items as the Company Group's sole and exclusive property, to be monitored, accessed, deleted, copied, disclosed or otherwise utilized as the Company Group shall in its sole discretion determine appropriate.

4.4. Return of Company Items and Confidential Information. If the Company, in its sole discretion, so requests or if the Employment Period is terminated, by Employee, the Company or otherwise, Employee shall immediately (a) cease all use of the Company Items and Confidential Information, (b) deliver to the Company all Company Items and Confidential Information in tangible form that are in the possession, custody or control of Employee and (c) certify in writing to the Company, in the form provided by the Company or as otherwise satisfactory to the Company in its sole discretion, that all such Company Items and Confidential Information have been so delivered. If the Company Items or Confidential Information are on digital media not belonging to the Company Group (Including a hard drive or other electronic equipment, tablet, phone or watch owned, rented or leased by Employee), Employee shall provide to the Company a copy on media acceptable to the Company in its sole discretion and permanently delete and overwrite all other copies of such Company Items and Confidential Information. Employee shall also promptly disclose all codes, credentials and passwords necessary to enable the Company to access the Company Items and Confidential Information.

**Non-Competition, Non-Solicitation, and Non-Disparagement**

7.2. Non-Competition After Employment Period. During the twelve (12) month period that immediately follows the Termination Date (the "*Post-Employment Restricted Period*"), regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise, Employee shall not, without the prior express written consent of the Company, signed by an Authorized Officer, directly or indirectly, anywhere in the Territory (defined in this Section 7.2., below), own, manage, operate or control (or participate in the ownership, management, operation or control of) a Competitive Business (defined in this Section 7.2., below) or, in a Related Capacity (defined in this Section 7.2., below) be employed by, or provide consulting, advisory or any other services, with or without compensation (whether in cash, equity or otherwise), to any Person engaged, or planning to engage, in a Competitive Business. Notwithstanding the foregoing, this Section 7.2. shall not preclude Employee from being an employee of, or from otherwise providing services to, a separate division or operating unit (a "*Division*") of a multi-divisional business or enterprise that is engaged in a Competitive Business (a "*Competitive Enterprise*") if the Division by which Employee is employed, or to which Employee provides services, is not engaged in a Competitive Business and Employee does not provide services, directly or indirectly, to any other division or operating unit of such Competitive Enterprise if such other division or operating unit is engaged in a Competitive Business. For purposes of this Agreement: (a) "*Competitive Business*" means any business, Including insurance and/or reinsurance, that competes within the Territory with any business in which the Company or any of the Served Affiliates was engaged, had in development or was planning to engage, at any time during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months); (b) "*Territory*" means any state within the United States and any state, province or other geographic or political subdivision of any other country, in which, or as to which, Employee provided services to the Company or any of the Served Affiliates at any time during the Employment Period; (c) "*Served Affiliates*" means (i) the Affiliates of the Company for which, or as to which, Employee provided services at any time during the Employment Period and (ii) the Affiliates of the Company for which, or as to which, Employee obtained or developed Confidential Information at any time during the Employment Period that would be of aid to Employee in directly or indirectly competing, or in directly or indirectly assisting any other Person to compete, with those Affiliates during the Post-Employment Restricted Period; and (d) "*Related Capacity*" means (i) any capacity or role related to, substantially similar to, or having duties or responsibilities similar to, the capacity(ies) or role(s) Employee holds or held, or in which Employee otherwise provides or provided services, for the Company and/or any of its Affiliates during the Employment Period or (ii) any other capacity or role in which the services to be provided by Employee would give the Competitive Business engaging Employee in such a capacity or role an unfair advantage over the Company or any other member of the Company Group as a result of Employee's access, during the Employment Period, to Confidential Information, to employees of the Company and/or its Affiliates, to Customers and other business relationships of the Company and/or its Affiliates and to the goodwill of the Company and/or its Affiliates with Customers and other business relationships.

7.3.1. Non-Solicitation of Customers and Other Business Relationships. From the effective date of this Agreement and continuing throughout the remainder of the Employment Period and during the twenty-four (24) month period that immediately follows the Termination Date (in the aggregate, the **"Customer Non-Solicitation Period"**), regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise, Employee shall not, without the

prior express written consent of the Company, signed by  an Authorized Officer, directly or indirectly, Including by assisting, soliciting, persuading, encouraging or otherwise inducing, or in any manner attempting to assist, solicit, persuade, encourage or otherwise induce, any Person to: (a) assist, solicit, persuade, encourage or otherwise induce, or in any manner attempt to assist, solicit, persuade, encourage or otherwise induce, any Customer, reinsurer or supplier to discontinue or diminish its or their relationship with the Company and/or any of its Affiliates; (b) assist, solicit, persuade, encourage or otherwise induce, or in any manner attempt to assist, solicit, persuade, encourage or otherwise induce, any Customer to conduct with any other Person any business (Including any program competitive with any Program) that such Customer conducts or could conduct with the Company and/or any of its Affiliates; (c) assist, solicit, persuade, encourage or otherwise induce, or in any manner attempt to assist, solicit, persuade, encourage or otherwise induce, any reinsurer to conduct with any other Person any business that is competitive with any Program as to which Employee provided to such reinsurer (or Employee is aware that such reinsurer has received) Confidential Information or other business information from the Company and/or any of its Affiliates; or (d) otherwise interfere with or disrupt, or in any manner attempt to interfere with or disrupt, any of the Company's and/or any of its Affiliates' relationships with any Customer, reinsurer or supplier; provided, however, that Employee's obligations under this Section 7.3.1. during that portion of the Customer Non-Solicitation Period that follows the Termination Date shall apply only to those Customers, reinsurers and suppliers that were doing business with the Company and/or any of its Affiliates at any time during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months) *and* (i) with which Employee had material personal dealings or for which Employee was responsible in a client management capacity during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months), (ii) with which someone under Employee's direct supervision had material personal dealings or for which someone under Employee's direct supervision was responsible in a client management capacity during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months), *or* (iii) as to which Employee obtained or developed Confidential Information or goodwill during the Employment Period that would assist Employee in competing, or in assisting other Persons to compete, with the Company Group for the business of such Customer, reinsurer or supplier. The Company, on the one hand, and Employee, on the other, expressly acknowledge and agree that this Section 7.3.1. in itself is not intended to, and will not, function as a covenant against competition.

7.3.2. Non-Solicitation of Employees and Other Service Providers. From the effective date of this Agreement and continuing throughout the remainder of the Employment Period and during the twenty-four (24) month period that immediately follows the Termination Date (in the aggregate, the "*Employee Non-Solicitation Period*"), regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise, Employee shall not, without the prior express written consent of the Company, signed by an Authorized Officer, directly or indirectly (a) recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, or in any manner attempt to recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, or (b) assist, solicit, persuade, encourage or otherwise induce, or in any manner attempt to assist, solicit, persuade, encourage or otherwise induce, any Person to recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, or to in any manner attempt to recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, any individual providing

services to the Company and/or any of its Affiliates, whether as an employee, consultant, independent contractor or otherwise, to (i) terminate or diminish, or in any manner attempt to terminate or diminish, such individual's employment or services to the Company and/or any of its Affiliates or (ii) accept employment or other service engagement with, or otherwise provide services to, or in any manner attempt to accept employment or other service engagement with, or otherwise provide services to, any Person other than the Company or any of its Affiliates. From the effective date of this Agreement and continuing throughout the remainder of the Employment Period, Employee's obligations under this Section 7.3.2. shall apply both with respect to those individuals who are employed by or otherwise providing services to the Company or any of its Affiliates and those individuals whose employment or services to the Company or its Affiliates terminate at any time during that period, regardless of the reason for such termination and whether it is initiated by the individual or by the Company or any of its Affiliates. During that portion of the Employee Non-Solicitation Period that follows the Termination Date, however, Employee's obligations under this Section 7.3.2. shall apply only with respect to those individuals who are hired or employed by or otherwise providing services to the Company and/or any of its Affiliates and those individuals who resign or otherwise cause their employment or services to terminate or be terminated at any time during the last twelve (12) months of the Employment Period or at any time during that portion of the Employee Non-Solicitation Period that follows the Termination Date. During that portion of the Employee Non-Solicitation Period that follows the Termination Date, however, Employee shall not be restricted from soliciting or recruiting any former employee or former service provider of the Company and/or any of its Affiliates whose employment or services are terminated by the Company or such Affiliate due to a reorganization, restructuring or lack of work, provided that such solicitation or recruiting is done on behalf of a Person that is not a Competitive Business.

7.4.1. Throughout the Employment Period and continuing thereafter until the date on which Employee has satisfied all of Employee's obligations under Section 7.1., Section 7.2. and Section 7.3. of this Agreement, Employee shall give not less than fifteen (15) business days' advance written notice to the Company of each New Business Activity (defined in this Section 7.4.1., below) before Employee undertakes such New Business Activity, which written notice shall in each instance state the name and address of the Person for which or with which the New Business Activity is to be undertaken and an accurate and complete description of the New Business Activity, Including Employee's proposed business relationship(s), position(s), title(s), duties, responsibilities and start date in the New Business Activity. Employee shall provide the Company with such other relevant, non-privileged information concerning each New Business Activity as the Company may from time to time require in order to determine Employee's continued compliance with all obligations of Employee to the Company or any of its Affiliates that survive termination of employment, whether pursuant to this Agreement or otherwise. A **"*New Business Activity*"** means any employment, services as an independent contractor or other business service arrangement or any ownership (subject to the final sentence of Section 7.1. of this Agreement), whether through a sole proprietorship, partnership, corporation or any other form of business organization, regardless of whether such employment, other service arrangement or ownership is with or without compensation.

7.4.2. Further, Employee agrees that throughout the Employment Period and thereafter for so long as Employee has any obligations under this Agreement that are intended by their provisions to survive termination of Employee's employment, Employee shall give notice of Employee's obligations under this Agreement, and provide a copy of this Agreement, to each Person from

which Employee directly or indirectly solicits a New Business Activity, each Person that directly or indirectly solicits Employee to engage in a New Business Activity, each Person from which Employee accepts employment or for which Employee otherwise agrees to provide services and each employment agency, employee recruiter and the like with which Employee deals while seeking, or being solicited for, employment or any other position as a service provider. Employee agrees that the Company and any of its Affiliates shall have the right to provide notice of Employee's obligations under this Agreement, orally and/or in writing and/or a copy of this Agreement to any Person that is an employee recruiter or the like; that is an employer or prospective employer of Employee; and any other Person that may engage Employee to provide services or that otherwise may engage with Employee in a New Business Activity. Employee agrees to defend, indemnify and hold all Company Related Persons harmless from any and all claims, costs and damages in any way Arising Out Of the Company or any of its Affiliates providing notice of Employee's obligations under this Agreement and/or a copy of this Agreement to any Person.

7.5. Non-Disparagement. From the effective date of this Agreement and continuing throughout the remainder of the Employment Period and following its termination, regardless of the reason Employee's employment terminates and whether termination is initiated by Employee, the Company or otherwise, Employee shall not, directly or indirectly, make, publish or communicate to any Person or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company, any of its Affiliates, any of their products or services or any of their respective shareholders, directors or officers. (Please note that this Section 7.5. is not intended, and is not to be interpreted, to restrict or discourage Employee from initiating or pursuing any bona fide complaint or grievance, whether through a discussion with an appropriate Company officer or manager or Human Resource representative, use of one of the complaint procedures maintained by the Company and its Affiliates or, where applicable, through the complaint procedure available under each of the Company's employee benefit plans or through any other available legal process. This Section 7.5. is also subject to Section 2.4. of this Agreement.).

## AFFIRMATION

I, Kelly Wolfram, state that I have no Guilford Specialty Group's (together, with its affiliates, the "Company") Confidential Information (as defined below) within my possession, custody, or control.

"Confidential Information" means (a) any and all information and materials, Including trade secrets, Arising Out Of the prior, current, contemplated or future business of the Company or any of its Affiliates that are of value to the Company and/or any of its Affiliates and that are not generally known by Persons with which the Company or any of its Affiliates competes or plans to compete and/or by Persons with which the Company or any of its Affiliates does business or plans to do business, Including information and materials Arising Out Of the prior, current, contemplated or future activities, operations, plans, Customers, suppliers, services, staffing, recruitment, methods, products, technology, software, negotiations, proposals, contracts, transactions, finances, assets or liabilities of the Company or any of its Affiliates (Including, in each case, the existence, status and any actual and proposed provisions thereof), (b) any and all information and materials of any Person, Including a Customer, supplier or licensor, with respect to which the Company or any of its Affiliates has any confidentiality obligation, (c) the Work Product (defined in this Section 1., below), (d) any and all passwords, network or systems login credentials, access protocols, security procedures, and other internal security and systems controls of the Company or any of its Affiliates and (e) any and all information or materials in whole or in part Arising Out Of any of the foregoing, Including notes, analyses, compilations, projections, studies or other information or materials prepared by, for or on behalf of Employee. Employee understands that the above list is not exhaustive and that Confidential Information also Includes other information and materials that are marked or otherwise identified (orally or in writing) as confidential or proprietary or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information or materials are known or used. Confidential Information Includes information and materials that may constitute "trade secrets" as that term is defined in the Wisconsin Uniform Trade Secrets Act, Wis. Stat. §134.90, as in effect from time to time (such Confidential Information, individually, a "Trade Secret" and, collectively, "Trade Secrets"). As of the effective date of this Agreement, Trade Secrets are defined in the Wisconsin Uniform Trade Secrets Act as "information . . . for which all of the following apply (i) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (ii) the information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances." Employee understands and agrees that Trade Secrets may Include information and materials Arising Out Of the activities, operations, plans, Customers, suppliers, services, staffing, recruitment, methods, products, technology, software, negotiations, proposals, contracts, transactions, finances, assets and/or liabilities of the Company and/or any of its Affiliates (Including, in each case, the existence, status and any actual and proposed provisions thereof). All other information and materials falling within this Paragraph that are not Trade Secrets are nonetheless Confidential Information. Confidential Information may be in tangible form Including materials in hardcopy and information stored electronically (Including on a computer hard-drive, a flash drive, thumb drive or any other electronic equipment or on a computer network or system). Confidential Information also may be in intangible form, Including information that is learned by listening or observing or that is remembered. The term "Confidential Information" does

not include information and materials that are or become public knowledge other than as a result of unauthorized use or disclosure by Employee or by any other Person that Employee knows, or reasonably should know, has a confidentiality obligation to the Company or any of its Affiliates; nor does it include information that is obtained from a third party having the right to disclose such information without restriction. The term "Confidential Information" also does not include knowledge and skills of a generalized nature, whether possessed by Employee prior to and outside of Employee's employment with the Company or acquired by Employee during Employee's employment with the Company.

I further state that I have not violated any non-solicitation covenant between myself, on one hand, and the Company, on the other hand.

I finally state that I have no Company property within my possession, custody, or control,

I declare under penalty of perjury that the foregoing is true and correct.


_____

Kelly Wolfram


_____

Date

CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT
WITH CERTAIN OTHER RESTRICTIVE COVENANTS

This Confidentiality and Intellectual Property Agreement with Certain Other Restrictive Covenants (referred to hereafter as this **"Agreement"**) is entered into by and between Kelly K. Wolfram (**"Employee"**), whose current address is 10718 47th Avenue, Pleasant Prairie, Wisconsin 53158, and Guilford Specialty Group, Inc. (the **"Company"**), effective as of the date this Agreement is signed by Employee.  This Agreement is ancillary to the letter agreement dated March 4, 2021 between Employee and the Company setting forth Employee's provisions and conditions of employment (the **"Letter of Employment"**) and to the employment relationship between Employee and the Company.  Certain capitalized terms used in this Agreement are defined in Section 1. of this Agreement; the remainder of capitalized terms are defined in context in this Agreement.

WHEREAS, Employee is currently employed by the Company in the exempt position of Vice President, Excess Casualty and has been offered a promotion to the exempt position of Senior Vice President, Head of Excess Casualty, which promotion is subject to Employee signing and returning this Agreement in a timely manner;

WHEREAS, as a result of Employee's promotion to this exempt position, Employee will have, in the normal course of employment with and services to the Company and/or its Affiliates (defined in Section 1. of this Agreement), access to trade secrets and/or other Confidential Information (defined in Section 1. of this Agreement), and to employees of the Company and/or its Affiliates, in addition to having regular contact with Customers (defined in Section 1. of this Agreement) and other business relationships of the Company and/or its Affiliates and to the goodwill of the Company and/or its Affiliates with Customers and other business relationships, all of which are valuable assets of the Company Group (defined in Section 1. of this Agreement); and

WHEREAS, it is the practice of the Company and its Affiliates to obtain agreements such as this as a condition of hiring, transfer, promotion or relocation, whether initiated by the Company or an employee;

NOW, THEREFORE, in consideration of the foregoing and of (i) the Company granting Employee the promotion as recited above, (ii) the Company granting Employee a salary increase in connection with and subject to Employee's signing and return of this Agreement and being granted the promotion and (iii) the Company granting Employee access to trade secrets and/or other Confidential Information, Customers and other business relationships of the Company and/or its Affiliates and the goodwill of the Company and/or its Affiliates with Customers and other business relationships in connection with Employee's employment by and services to the Company and/or its Affiliates hereafter, with the foregoing being agreed by Employee and the Company to constitute good, valuable and sufficient consideration for this Agreement, both individually and in the aggregate, Employee and the Company hereby further agree as follows:

1.     **Certain Definitions.**  For purposes of this Agreement:

**"Affiliate"** (collectively, **"Affiliates"**) means, with respect to any Person (defined in this Section 1., below), any other Person directly or indirectly controlling, controlled by or under common control with such first Person, where control may be by management authority, equity interest, contract or otherwise.  **"Affiliates"** Include (defined in this Section 1., below) not only individuals and legal entities (Including corporations and limited liability companies), but also unincorporated organizations, groups, operating units, divisions and the like.

**"Arising Out Of"** means arising out of, in connection with or in any way related to.

**"Authorized Officer"** means a member of the board of directors of the Company or an officer of the Company who, in each case, is expressly authorized in writing by the chairman of the board of directors of the Company (the **"Chairman of the Company"**), acting in his sole discretion, to function on behalf of the Company within the scope of such authorization.

**"Company Group"** means the Company and its Affiliates.

**"Company Related Persons"** means the Company and its Affiliates and all of their respective shareholders, directors, officers, employees, agents, contractors, consultants, attorneys and other

representatives.  A **"Company Related Person"** means any one of the foregoing.

      **"Confidential Information"** means (a) any and all information and materials, Including trade secrets, Arising Out Of the prior, current, contemplated or future business of the Company or any of its Affiliates that are of value to the Company and/or any of its Affiliates and that are not generally known by Persons with which the Company or any of its Affiliates competes or plans to compete and/or by Persons with which the Company or any of its Affiliates does business or plans to do business, Including information and materials Arising Out Of the prior, current, contemplated or future activities, operations, plans, Customers, suppliers, services, staffing, recruitment, methods, products, technology, software, negotiations, proposals, contracts, transactions, finances, assets or liabilities of the Company or any of its Affiliates (Including, in each case, the existence, status and any actual and proposed provisions thereof), (b) any and all information and materials of any Person, Including a Customer, supplier or licensor, with respect to which the Company or any of its Affiliates has any confidentiality obligation, (c) the Work Product (defined in this Section 1., below), (d) any and all passwords, network or systems login credentials, access protocols, security procedures, and other internal security and systems controls of the Company or any of its Affiliates and (e) any and all information or materials in whole or in part Arising Out Of any of the foregoing, Including notes, analyses, compilations, projections, studies or other information or materials prepared by, for or on behalf of Employee.  Employee understands that the above list is not exhaustive and that Confidential Information also Includes other information and materials that are marked or otherwise identified (orally or in writing) as confidential or proprietary or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information or materials are known or used.  Confidential Information Includes information and materials that may constitute "*trade secrets*" as that term is defined in the Wisconsin Uniform Trade Secrets Act, Wis. Stat. §134.90, as in effect from time to time (such Confidential Information, individually, a **"Trade Secret" and**, collectively, **"Trade Secrets"**).  As of the effective date of this Agreement, Trade Secrets are defined in the Wisconsin Uniform Trade Secrets Act as "information . . . for which all of the following apply (i) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (ii) the information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances."  Employee understands and agrees that Trade Secrets may Include information and materials Arising Out Of the activities, operations, plans, Customers, suppliers, services, staffing, recruitment, methods, products, technology, software, negotiations, proposals, contracts, transactions, finances, assets and/or liabilities of the Company and/or any of its Affiliates (Including, in each case, the existence, status and any actual and proposed provisions thereof).  All other information and materials falling within this Paragraph that are not Trade Secrets are nonetheless Confidential Information.  Confidential Information may be in tangible form Including materials in hardcopy and information stored electronically (Including on a computer hard-drive, a flash drive, thumb drive or any other electronic equipment or on a computer network or system).  Confidential Information also may be in intangible form, Including information that is learned by listening or observing or that is remembered.  The term "*Confidential Information*" does not include information and materials that are or become public knowledge other than as a result of unauthorized use or disclosure by Employee or by any other Person that Employee knows, or reasonably should know, has a confidentiality obligation to the Company or any of its Affiliates; nor does it include information that is obtained from a third party having the right to disclose such information without restriction.  The term "*Confidential Information*" also does not include knowledge and skills of a generalized nature, whether possessed by Employee prior to and outside of Employee's employment with the Company or acquired by Employee during Employee's employment with the Company.

      **"Customers"** means (a) those Persons generally referred to in the insurance and reinsurance industry as wholesalers, brokers, producers, agents, general agents, managing general agents, managing general underwriters, program administrators and the like (**"Producers"**) which do business with the Company and/or any of its Affiliates (and, with respect to any Producer that is a corporation, limited liability company or other legal entity, such Producer shall be understood to include (i) the entity itself and (ii) all of its Affiliates that do, or have done, business with the Company or any of its Affiliates in one or more of the aforementioned capacities), (b) Program Groups (described within Program in this Section 1., below) and the Persons within those Program Groups, (c) insureds and reinsureds of the Company and/or any of its Affiliates, and (d) any and all other Persons to which the Company and/or any of its Affiliates directly or indirectly sell their products and services.

      **"Employment Period"** means, in the aggregate, the period during which Employee is employed by the Company and any contiguous periods in which Employee is employed by any of its Affiliates or any of its or their successors or assigns from Employee's most recent date of hire through the date that Employee's

employment terminates (regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise).

"**Including**" (or "**Include**" or "**Includes**") means including but not limited to.

"**Person**" shall be broadly read, understood and interpreted to Include any individual, firm, company, limited liability company, corporation, limited liability corporation, partnership, limited liability partnership, joint venture, association, joint-stock company, trust, estate, organization (whether or not incorporated), governmental body or other entity.  For brevity, pronouns used in this Agreement to refer to a Person are gender neutral; nonetheless, the Person referred to may be either an individual or an entity.  Thus, Including by way of example, when referring to a Person, "it" means "he, she, they or it," "to which" means "to whom or to which" and "that" means "who or which."  Similarly, the term "**Persons**" shall be understood to include individuals and/or entities, regardless of the pronoun used to refer to those Persons.

"**Prior Confidentiality Agreements**" means (a)  the agreement captioned "Confidentiality Agreement with Certain Other Restrictive Covenants" that Employee signed with the Company, effective March 5, 2021 and (b) the agreement captioned "Confidentiality Agreement with Certain Other Restrictive Covenants" that Employee signed with the Company, effective November 1, 2022, with each such agreement being referred to as a "**Prior Confidentiality Agreement**."

"**Program**" means any insurance and/or reinsurance program that is developed by or for the Company and/or any of its Affiliates for a Program Group (described in this Section 1., below), based on any one or more commonalities and/or common factors of the Persons within the Program Group, where commonalities may Include those Persons' insurable and/or reinsurable needs and/or a common direct or indirect association with each other and/or common interests and/or categories of risk and/or geographic proximity and common factors may Include a common occupation or profession, other common interests or a common demographic factor, Including family size, education or income level.  Without limitation, a "**Program Group**" may be comprised of (a) one or more established organizations or associations (Including affinity groups) where the Persons within the Program Group share any one or more commonalities or common factors relevant to one or more Programs, (b) a group of currently unaffiliated Persons that are identified or developed by or for the Company or one or more of its Affiliates and/or (c) Persons that are solicited by or come to the Company or any of its Affiliates, where all of the Persons within a Program Group share one or more commonalities and/or other common factors.  A Program may be marketed to a Program Group and/or directly to the Persons within the Program Group and/or it may be marketed through Producers or otherwise.

"**Termination Date**" means the last day of the Employment Period.

"**Work Product**" means all information, inventions, discoveries, developments, compositions, concepts, ideas, materials, works (as such term is used in the Copyright Act [defined in Section 3.1., below]), writings, arts, techniques, methods, processes, mask works, software, algorithms, technology, machines, equipment, devices, manufactures, articles, designs, trade dress, or new uses for or improvements of or to any of the foregoing (and in each case, whether or not copyrighted, copyrightable, patented, patentable, registered or registrable), conceived, created, discovered, invented, made, produced, prepared, written, reduced to practice or otherwise developed at any time during the Employment Period by Employee (whether working alone or together with other Persons, whether during business hours or otherwise, and whether on or off the Company Group's premises), in whole or in part Arising Out Of (a) Employee's performance of any services for the Company or any of its Affiliates, (b) Employee's obligations as an employee of the Company for the Company Group or any of its members, (c) any prior, current, contemplated or future business of the Company or any of its Affiliates or (d) any information or materials Arising Out Of any of the foregoing or owned directly or indirectly by the Company or any of its Affiliates.  The term "*Work Product*" shall not apply to any invention that Employee can demonstrate qualifies fully as follows: (i) was developed entirely on Employee's own time; (ii) was developed without using any of the equipment, supplies, facilities, trade secrets or other Confidential Information of the Company or any of its Affiliates, (iii) at the time of conception or reduction to practice is unrelated to the business of the Company or any of its Affiliates or to the actual or demonstrably anticipated research or development of the Company or any of its Affiliates and (iv) does not result from any work performed by Employee for the Company or any of its Affiliates.



## 2. Confidentiality and Non-Disclosure.

2.1. <u>Disclosure and Use Restrictions</u>. Employee understands and acknowledges that, during Employee's employment with the Company and/or any of its Affiliates to date as an exempt employee, Employee has had, and following promotion will continue to have, access to Confidential Information in the normal course of employment and may have developed and, following promotion, also may develop Confidential Information in the course of providing services for the Company and/or any of its Affiliates. All Confidential Information, Including all Confidential Information developed by Employee, shall, as between Employee and the Company and/or any of its Affiliates, remain at all times the sole and exclusive property of the Company and/or any of its Affiliates. Employee agrees to hold, throughout the Employment Period, all Confidential Information in strict trust and confidence for the Company. Further, Employee represents, warrants and agrees that throughout the Employment Period, Employee has not, and shall not hereafter, throughout the Employment Period, directly or indirectly, (a) disclose or disseminate any Confidential Information or (b) access, copy or use any Confidential Information, except, in each case, for the benefit of the Company Group in the normal course of properly performing Employee's regular duties as an employee of the Company or otherwise for the benefit of the Company Group with the express advance written approval of an Authorized Officer. Following the Employment Period, Employee shall not (i) at any time, directly or indirectly, disclose, disseminate, access, copy or use any Trade Secret and (ii) during the Post-Employment Non-Disclosure Restricted Period (defined in this Section 2.1., below), anywhere in the Post-Employment Non-Disclosure Territory (defined in this Section 2.1., below), directly or indirectly, disclose, disseminate, access, copy or use any Confidential Information, whether or not a Trade Secret, unless, in each case, the Employee has previously received express written authorization signed by an Authorized Officer. Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's services during the Employment Period shall be subject to the provisions and conditions of this Agreement as if the Company and/or any of its Affiliates had furnished the same Confidential Information to Employee in the first instance. Further, without limiting the generality of the previous sentences, and subject to the other provisions of this Agreement, Employee understands and agrees that Confidential Information is to be shared only on a need-to-know basis even within the Company or the Company Group; that Confidential Information is never to be left unattended where it may be seen by Customers or other visitors to the premises of the Company and/or any of its Affiliates (Including, for example, seen on a desk top or a computer monitor); and that, even on such premises, Confidential Information is not to be discussed in elevators, halls or any other place where Customers or other visitors to the premises of the Company and/or any of its Affiliates may overhear it. This Section 2.1., however, is not intended to restrict and does not restrict Employee from disseminating or using (i) information that is published or available to the general public (other than as a result of an improper or unauthorized disclosure by Employee or by any other Person that Employee knows, or reasonably should know, has a confidentiality obligation to the Company or any of its Affiliates), (ii) information that is obtained from a third party having the right to disclose such information without restriction, (iii) the knowledge and skills of a generalized nature, whether possessed by Employee prior to and outside of Employee's employment with the Company or acquired by Employee during Employee's employment with the Company or (iv) information the disclosure of which is expressly permitted by or otherwise subject to Section 2.4. of this Agreement. For purposes of this Agreement: (a) **"Post-Employment Non-Disclosure Restricted Period"** means the twenty-four (24) month period that immediately follows the Termination Date; and (b) **"Post-Employment Non-Disclosure Territory"** means anywhere within the United States and any state, province or other geographic or political subdivision of any other country, in which, or as to which, the Company or any of the Served Affiliates (defined in Section 7.2., below) conducted business or otherwise operated or provided services at any time during the Employment Period.

2.2. <u>Compliance with Law</u>. If Employee becomes obligated by any law, regulation, judgment, order, subpoena or similar requirement of any governmental or regulatory authority or court of competent jurisdiction to disclose any Confidential Information in a manner that would violate the other provisions of this Agreement, Employee shall (a) promptly, and, in any event before any such disclosure is made, notify the Company of such requirement (except as provided in Section 2.4. of this Agreement or as otherwise prohibited by law), and cooperate as the Company and/or any of its Affiliates may request, at the Company's expense, in any effort by the Company and/or any of its Affiliates to object to or limit such disclosure or requirement, or to obtain a protective order or other appropriate relief with respect to such Confidential Information, (b) furnish only that portion of the Confidential Information as Employee reasonably determines or is advised by counsel is legally required to be furnished and (c) exercise best efforts to obtain reliable assurance that confidential treatment will be accorded whatever Confidential Information is disclosed.

2.3. <u>Cooperation</u>. Employee shall notify the Company immediately of any known, suspected or

threatened (a) breach of this Agreement or (b) loss, unauthorized use or unauthorized disclosure of Confidential Information by Employee or any other Person, subject to the other provisions of this Agreement. Employee shall cooperate as requested by Company and/or any of its Affiliates with efforts by the Company and/or any of its Affiliates to regain possession of the Confidential Information and prevent its further unauthorized use. Further, Employee shall cooperate in any investigation or proceeding in connection with the foregoing or otherwise, Including by providing, promptly and in full, truthful information and relevant materials to Authorized Officers and other Company Related Persons expressly designated by the Chairman of the Company to receive such information and materials.

2.4.    Notice.  Employee is hereby given notice that employees shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (a) is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Nothing contained in this Agreement, any other agreement with the Company or any Company policy limits an employee's ability to communicate with any federal, state or local governmental agency or commission, Including the Equal Employment Opportunity Commission, the National Labor Relations Board or the Securities and Exchange Commission, without notice to the Company or to share compensation information regarding himself/herself or others, except that (x) this does not permit an employee to disclose compensation information of others obtained in violation of Company policies, Including its policy on data security, or because the employee's job responsibilities require or allow access to such information and (y) a supervisory employee may not share compensation information regarding himself/herself or others, except to the extent that applicable state law prohibits restrictions on the sharing of such information.  Further, nothing contained in this Agreement, Including the non-disclosure and non-disparagement provisions of this Agreement, any other agreement with the Company or any Company policy restricts Employee from making a complaint or claim or otherwise disclosing any conduct regarding unlawful employment discrimination or harassment and, not limiting the foregoing, the Company strongly urges Employee to report any such conduct as soon as possible to a Human Resource representative, whether in person, by telephone, e-mail or other writing.

3.    **Work Product and Proprietary Rights.**

3.1.    Ownership of Work Product.  Employee agrees that, from the effective date of this Agreement and thereafter during the remainder of the Employment Period, Employee shall maintain accurate and complete records of, and shall promptly and fully disclose and deliver to the Company, all Work Product.  To the fullest extent legally permitted, the Company shall be the sole and original owner of, and shall have sole and exclusive right, title and interest in and to, all (a) Work Product and (b) copyright, patent, trademark, trade secret and other intellectual property and proprietary rights in all countries Arising Out Of the Work Product (collectively, **"Related Rights"**).  Further, Employee acknowledges that (i) by reason of being employed by the Company during the Employment Period, whether before or after Employee's promotion, to the fullest extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" (as that term is used in Title 17 of the U.S. Code, as amended [the **"Copyright Act"**]), and such copyrights are therefore owned by the Company, and (ii) any registration of this Agreement as a copyright assignment shall not imply that such works are not works made for hire.

3.2.    Assignment of Rights in Work Product.  In addition, Employee hereby assigns, and shall assign hereafter to the Company or its nominee, as requested, at any time and from time to time and without additional compensation, irrevocably and in perpetuity, all right, title and interest, whether now existing or hereafter arising, that Employee may have in or to all Work Product and Related Rights, Including the right to sue, counterclaim and recover for all past, present and future infringement, misappropriation or dilution thereof, and all rights corresponding thereto throughout the world.

3.3.    Further Documentation.  Employee shall, without additional compensation, execute and deliver to the Company all applications, oaths, declarations, affidavits, waivers, assignments and other documents and instruments which the Company may in its sole discretion deem necessary or convenient, and take such other actions at the Company's expense as the Company may in its sole discretion request, in order to (a) apply for, register, obtain and perfect the Company's rights in the Work Product and Related Rights, (b) vest or evidence the Company's right, title and interest in and to all Work Product and Related Rights and (c) maintain, protect and enforce the same.  Employee (i) hereby irrevocably grants to the Company the right and power, in Employee's



name and on Employee's behalf, as Employee's attorney-in-fact, to execute all such instruments which Employee is obligated to execute under this Agreement and (ii) agrees that such power of attorney is coupled with an interest and shall survive Employee's death or disability.

       3.4.   <u>Waiver of Moral Rights</u>.  Employee hereby irrevocably waives any right to limit in any way the ability of any Company Related Person to (or to authorize others to) use, make, sell, improve, reproduce, modify, disclose, distribute, create derivative works based upon and otherwise exploit, the Work Product or Related Rights.  Without limiting the foregoing, Employee hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all claims Employee may now or hereafter have in any jurisdiction to all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as "moral rights" with respect to all Work Product and all Related Rights.

    **4.**   **Company Items.**

       4.1.   <u>Use of Company Items</u>.

       4.1.1.  Except as may be (a) required to properly perform Employee's obligations as an employee of the Company, (b) expressly authorized in writing in advance by an Authorized Officer or (c) otherwise expressly provided by this Agreement, Employee shall not, and Employee has no right or power to authorize any other Person to: use, access, disclose, deliver, sell, transfer, export, reproduce, modify, supplement (Including by adding any software or data, by combining with any other item or otherwise), prepare derivative works based upon, destroy, delete, remove from the premises of the Company Group or disrupt the operation, integrity or security of, any Company Items (defined in this Section 4.1.1., below) or Confidential Information (Including Work Product) or any portion of either of the foregoing.  As used in this Agreement, the term **"Company Items"** means any and all materials, items, equipment, technology, facilities and other property owned, rented or leased by the Company or any other member of the Company Group provided or made available to Employee by any Company Related Person or otherwise, Including those produced by Employee, directly or indirectly in the course of Employee's employment or Employee performing services for the Company and/or its Affiliates or otherwise and those derived from any of the foregoing.  Examples of Company Items Include Company-owned or Company-provided computers, computer systems and related equipment, software, telephones and voice mail systems and other electronic equipment, websites (Including internet, extranet, intranet sites and social media sites), e-mail and instant messaging systems, document storage systems, storage equipment, digital media and hard drives, networking equipment, firewalls and encryption technologies and equipment, photocopying and scanning equipment, card keys, ID badges and other physical security equipment and access control systems, and passwords, login credentials and access codes.  Employee shall not remove, and shall not permit the removal of, any notice, legend, identification, evidence or other marking concerning confidentiality, ownership or proprietary rights that are contained on or included in any Company Items or Confidential Information.  Further, Employee represents and warrants that, throughout the time from the beginning of the Employment Period through the date Employee signs this Agreement, Employee has not engaged in any act or omission that would have violated any provision of this Section 4.1., had this Agreement been in effect during that time.

       4.1.2.  Further, Company Items (Including computer hardware and software, telephone and paging equipment, voice mail, text messaging, e-mail and other electronic equipment and systems) are provided for the conduct of the business of the Company Group and are not to be used for other purposes.  Accordingly, Employee shall not store, process, transmit or otherwise access Employee's own information or materials on Company Items.  Employee acknowledges and agrees that the Company Group shall have the right to regard and treat any information or materials that Employee may store, process, transmit or otherwise access using Company Items as the Company Group's sole and exclusive property, to be monitored, accessed, deleted, copied, disclosed or otherwise utilized as the Company Group shall in its sole discretion determine appropriate.

       4.2.   <u>Use of Third Party Materials</u>.  Employee represents, warrants and agrees that throughout the Employment Period Employee has not disclosed and shall not disclose to the Company or any Company Related Person, and has not induced and shall not induce the Company or any Company Related Person to use any Third Party Materials (defined in this Section 4.2., below).  Employee further represents, warrants and agrees that, throughout the Employment Period, Employee (a) has not brought and shall not bring any Third Party Materials onto the premises of the Company or any of its Affiliates, (b) has not entered or transferred and shall not enter or transfer any Third Party Materials onto any of the systems of the Company or any of its Affiliates, (c) has not incorporated or embedded and shall not incorporate or embed any Third Party Materials into any Work



Product or any product, process, code or Program of the Company or any of its Affiliates and (d) otherwise has not made and shall not make use of any Third Party Materials in the performance of Employee's duties for and other obligations to the Company or any of its Affiliates, unless disclosure to, and use by, the Company Group has been expressly authorized in writing by the owner of the Third Party Materials and by an Authorized Officer. As used in this Agreement, the term **"*Third Party Materials*"** means (i) any inventions, works of authorship, confidential or proprietary information or trade secrets belonging to any of Employee's previous employers or any other Person, exclusive only of members of the Company Group and (ii) any other information or materials that are otherwise subject to any limitations on disclosure or use that apply to the Company and/or any of its Affiliates. If Employee has an ownership interest in any inventions, original works of authorship, confidential or proprietary information or trade secrets that were made by Employee before Employee's employment with the Company (**"*Prior Inventions*"**) and if, in the course of the Employment Period, Employee incorporated or incorporates or embedded or embeds a Prior Invention into any Work Product or any product, process, code or Program of the Company or any of its Affiliates, then the Company is hereby granted and shall have an unrestricted, non-exclusive, royalty-free, fully-paid up, irrevocable, perpetual, worldwide license, Including the right to sublicense, to make, have made, use, reproduce, modify, display, perform, sell, import, export and otherwise distribute such Prior Invention as part of or in connection with such Work Product or product, process, code or Program of the Company or any of its Affiliates.

    4.3.    **Intentionally Omitted.**

    4.4.    <u>Return of Company Items and Confidential Information</u>.  If the Company, in its sole discretion, so requests or if the Employment Period is terminated, by Employee, the Company or otherwise, Employee shall immediately (a) cease all use of the Company Items and Confidential Information, (b) deliver to the Company all Company Items and Confidential Information in tangible form that are in the possession, custody or control of Employee and (c) certify in writing to the Company, in the form provided by the Company or as otherwise satisfactory to the Company in its sole discretion, that all such Company Items and Confidential Information have been so delivered.  If the Company Items or Confidential Information are on digital media not belonging to the Company Group (Including a hard drive or other electronic equipment, tablet, phone or watch owned, rented or leased by Employee), Employee shall provide to the Company a copy on media acceptable to the Company in its sole discretion and permanently delete and overwrite all other copies of such Company Items and Confidential Information.  Employee shall also promptly disclose all codes, credentials and passwords necessary to enable the Company to access the Company Items and Confidential Information.

    **5.**    **Compliance.**  Employee represents and warrants that (a) neither Employee's employment by the Company in the exempt position to which Employee is to be promoted, subject to Employee signing and return of this Agreement to the Company, nor Employee's services to the Company and its Affiliates in that exempt position, nor the execution and performance of this Agreement shall breach or be in conflict with any other agreement to which Employee is a party to or by which Employee is bound and (b) Employee is not now and has not been at any time, from the beginning of the Employment Period through the effective date of this Agreement, subject to any covenants against competition or against the solicitation of customers or employees or any similar covenants or to any limitations on employment, limitations on the disclosure or use of information or other restrictions or any order of a court, arbitrator or other authority that has been in the past, is now or upon Employee's promotion will be, incompatible with the full and complete performance of Employee's job duties and other obligations as an employee of the Company, Including under this Agreement, or that might otherwise affect the performance of Employee's services to the Company or any of its Affiliates.

    **6.**    **At-Will Employment; Termination of Employment; Survival of Employee's Obligations.**  Employee acknowledges and agrees that this Agreement does not constitute a contract of employment for a definite or specific term; that Employee's employment has been and shall continue to be on an at-will basis throughout the Employment Period; and that either the Company or Employee may terminate Employee's employment at any time, with or without notice or cause.  In the event of the termination of Employee's employment, Employee must satisfy all of the following on or before the Termination Date: (a) Employee must cooperate with the Company Group to the extent requested by the Company Group in all matters Arising Out Of the winding-up or transfer to designated Company Related Persons of Employee's then current duties and other obligations and pending and prior work for the Company Group and of any and all Customer relationships and other business relationships that Employee was assigned or developed in the course of employment and (b) Employee must comply with Section 4.4. of this Agreement.  Employee's failure to satisfy either or both of the foregoing obligations shall constitute a breach of this Agreement, except to the extent Employee's performance



of such obligations is waived by the Company in writing, signed by an Authorized Officer. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, ALL OF EMPLOYEE'S OBLIGATIONS AND THE RIGHTS OF THE COMPANY GROUP ARISING OUT OF THIS AGREEMENT SHALL SURVIVE ANY TERMINATION OF EMPLOYEE'S EMPLOYMENT, REGARDLESS OF THE REASON AND WHETHER TERMINATION IS INITIATED BY EMPLOYEE OR THE COMPANY OR OTHERWISE.

**7. Non-Competition; Non-Solicitation; and Non-Disparagement.**

7.1. <u>Non-Competition During Employment Period</u>. From the effective date of this Agreement and continuing throughout the remainder of the Employment Period, Employee shall not, directly or indirectly, whether as an owner, investor, officer, employee, consultant, agent or representative or in any other capacity, compete or assist any other Person to compete, anywhere in the United States or in any other country, with any business in which the Company or any of its Affiliates is engaged, or has under consideration, at any time during the Employment Period. Section 7. of this Agreement shall not be violated by Employee's passive ownership of 2% or less of the equity securities of any publicly traded company.

7.2. <u>Non-Competition After Employment Period</u>. During the twelve (12) month period that immediately follows the Termination Date (the **"Post-Employment Restricted Period"**), regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise, Employee shall not, without the prior express written consent of the Company, signed by an Authorized Officer, directly or indirectly, anywhere in the Territory (defined in this Section 7.2., below), own, manage, operate or control (or participate in the ownership, management, operation or control of) a Competitive Business (defined in this Section 7.2., below) or, in a Related Capacity (defined in this Section 7.2., below) be employed by, or provide consulting, advisory or any other services, with or without compensation (whether in cash, equity or otherwise), to any Person engaged, or planning to engage, in a Competitive Business. Notwithstanding the foregoing, this Section 7.2. shall not preclude Employee from being an employee of, or from otherwise providing services to, a separate division or operating unit (a **"Division"**) of a multi-divisional business or enterprise that is engaged in a Competitive Business (a **"Competitive Enterprise"**) if the Division by which Employee is employed, or to which Employee provides services, is not engaged in a Competitive Business and Employee does not provide services, directly or indirectly, to any other division or operating unit of such Competitive Enterprise if such other division or operating unit is engaged in a Competitive Business. For purposes of this Agreement: (a) **"Competitive Business"** means any business, Including insurance and/or reinsurance, that competes within the Territory with any business in which the Company or any of the Served Affiliates was engaged, had in development or was planning to engage, at any time during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months); (b) **"Territory"** means any state within the United States and any state, province or other geographic or political subdivision of any other country, in which, or as to which, Employee provided services to the Company or any of the Served Affiliates at any time during the Employment Period; (c) **"Served Affiliates"** means (i) the Affiliates of the Company for which, or as to which, Employee provided services at any time during the Employment Period and (ii) the Affiliates of the Company for which, or as to which, Employee obtained or developed Confidential Information at any time during the Employment Period that would be of aid to Employee in directly or indirectly competing, or in directly or indirectly assisting any other Person to compete, with those Affiliates during the Post-Employment Restricted Period; and (d) **"Related Capacity"** means (i) any capacity or role related to, substantially similar to, or having duties or responsibilities similar to, the capacity(ies) or role(s) Employee holds or held, or in which Employee otherwise provides or provided services, for the Company and/or any of its Affiliates during the Employment Period or (ii) any other capacity or role in which the services to be provided by Employee would give the Competitive Business engaging Employee in such a capacity or role an unfair advantage over the Company or any other member of the Company Group as a result of Employee's access, during the Employment Period, to Confidential Information, to employees of the Company and/or its Affiliates, to Customers and other business relationships of the Company and/or its Affiliates and to the goodwill of the Company and/or its Affiliates with Customers and other business relationships.

7.3. <u>Non-Solicitation</u>.

7.3.1. <u>Non-Solicitation of Customers and Other Business Relationships</u>. From the effective date of this Agreement and continuing throughout the remainder of the Employment Period and during the twenty-four (24) month period that immediately follows the Termination Date (in the aggregate, the **"Customer Non-Solicitation Period"**), regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise, Employee shall not, without the prior express written consent of the Company, signed by



an Authorized Officer, directly or indirectly, Including by assisting, soliciting, persuading, encouraging or otherwise inducing, or in any manner attempting to assist, solicit, persuade, encourage or otherwise induce, any Person to: (a) assist, solicit, persuade, encourage or otherwise induce, or in any manner attempt to assist, solicit, persuade, encourage or otherwise induce, any Customer, reinsurer or supplier to discontinue or diminish its or their relationship with the Company and/or any of its Affiliates; (b) assist, solicit, persuade, encourage or otherwise induce, or in any manner attempt to assist, solicit, persuade, encourage or otherwise induce, any Customer to conduct with any other Person any business (Including any program competitive with any Program) that such Customer conducts or could conduct with the Company and/or any of its Affiliates; (c) assist, solicit, persuade, encourage or otherwise induce, or in any manner attempt to assist, solicit, persuade, encourage or otherwise induce, any reinsurer to conduct with any other Person any business that is competitive with any Program as to which Employee provided to such reinsurer (or Employee is aware that such reinsurer has received) Confidential Information or other business information from the Company and/or any of its Affiliates; or (d) otherwise interfere with or disrupt, or in any manner attempt to interfere with or disrupt, any of the Company's and/or any of its Affiliates' relationships with any Customer, reinsurer or supplier; provided, however, that Employee's obligations under this Section 7.3.1. during that portion of the Customer Non-Solicitation Period that follows the Termination Date shall apply only to those Customers, reinsurers and suppliers that were doing business with the Company and/or any of its Affiliates at any time during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months) *and* (i) with which Employee had material personal dealings or for which Employee was responsible in a client management capacity during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months), (ii) with which someone under Employee's direct supervision had material personal dealings or for which someone under Employee's direct supervision was responsible in a client management capacity during the last twelve (12) months of the Employment Period (or at any time during the Employment Period, if the Employment Period is less than twelve (12) months), *or* (iii) as to which Employee obtained or developed Confidential Information or goodwill during the Employment Period that would assist Employee in competing, or in assisting other Persons to compete, with the Company Group for the business of such Customer, reinsurer or supplier. The Company, on the one hand, and Employee, on the other, expressly acknowledge and agree that this Section 7.3.1. in itself is not intended to, and will not, function as a covenant against competition.

   7.3.2. <u>Non-Solicitation of Employees and Other Service Providers</u>. From the effective date of this Agreement and continuing throughout the remainder of the Employment Period and during the twenty-four (24) month period that immediately follows the Termination Date (in the aggregate, the **"*Employee Non-Solicitation Period*"**), regardless of the reason for termination and whether it is initiated by Employee, the Company or otherwise, Employee shall not, without the prior express written consent of the Company, signed by an Authorized Officer, directly or indirectly (a) recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, or in any manner attempt to recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, or (b) assist, solicit, persuade, encourage or otherwise induce, or in any manner attempt to assist, solicit, persuade, encourage or otherwise induce, any Person to recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, or to in any manner attempt to recruit, solicit, persuade, encourage or otherwise induce or employ or otherwise engage, any individual providing services to the Company and/or any of its Affiliates, whether as an employee, consultant, independent contractor or otherwise, to (i) terminate or diminish, or in any manner attempt to terminate or diminish, such individual's employment or services to the Company and/or any of its Affiliates or (ii) accept employment or other service engagement with, or otherwise provide services to, or in any manner attempt to accept employment or other service engagement with, or otherwise provide services to, any Person other than the Company or any of its Affiliates. From the effective date of this Agreement and continuing throughout the remainder of the Employment Period, Employee's obligations under this Section 7.3.2. shall apply both with respect to those individuals who are employed by or otherwise providing services to the Company or any of its Affiliates and those individuals whose employment or services to the Company or its Affiliates terminate at any time during that period, regardless of the reason for such termination and whether it is initiated by the individual or by the Company or any of its Affiliates. During that portion of the Employee Non-Solicitation Period that follows the Termination Date, however, Employee's obligations under this Section 7.3.2. shall apply only with respect to those individuals who are hired or employed by or otherwise providing services to the Company and/or any of its Affiliates and those individuals who resign or otherwise cause their employment or services to terminate or be terminated at any time during the last twelve (12) months of the Employment Period or at any time during that portion of the Employee Non-Solicitation Period that follows the Termination Date. During that portion of the Employee Non-Solicitation Period that follows the Termination Date, however, Employee shall not be restricted from soliciting or recruiting any former employee or

former service provider of the Company and/or any of its Affiliates whose employment or services are terminated by the Company or such Affiliate due to a reorganization, restructuring or lack of work, provided that such solicitation or recruiting is done on behalf of a Person that is not a Competitive Business.

      7.4.    Notification Requirements.

          7.4.1.  Throughout the Employment Period and continuing thereafter until the date on which Employee has satisfied all of Employee's obligations under Section 7.1., Section 7.2. and Section 7.3. of this Agreement, Employee shall give not less than fifteen (15) business days' advance written notice to the Company of each New Business Activity (defined in this Section 7.4.1., below) before Employee undertakes such New Business Activity, which written notice shall in each instance state the name and address of the Person for which or with which the New Business Activity is to be undertaken and an accurate and complete description of the New Business Activity, Including Employee's proposed business relationship(s), position(s), title(s), duties, responsibilities and start date in the New Business Activity.  Employee shall provide the Company with such other relevant, non-privileged information concerning each New Business Activity as the Company may from time to time require in order to determine Employee's continued compliance with all obligations of Employee to the Company or any of its Affiliates that survive termination of employment, whether pursuant to this Agreement or otherwise.  A **"New Business Activity"** means any employment, services as an independent contractor or other business service arrangement or any ownership (subject to the final sentence of Section 7.1. of this Agreement), whether through a sole proprietorship, partnership, corporation or any other form of business organization, regardless of whether such employment, other service arrangement or ownership is with or without compensation.

          7.4.2.  Further, Employee agrees that throughout the Employment Period and thereafter for so long as Employee has any obligations under this Agreement that are intended by their provisions to survive termination of Employee's employment, Employee shall give notice of Employee's obligations under this Agreement, and provide a copy of this Agreement, to each Person from which Employee directly or indirectly solicits a New Business Activity, each Person that directly or indirectly solicits Employee to engage in a New Business Activity, each Person from which Employee accepts employment or for which Employee otherwise agrees to provide services and each employment agency, employee recruiter and the like with which Employee deals while seeking, or being solicited for, employment or any other position as a service provider.  Employee agrees that the Company and any of its Affiliates shall have the right to provide notice of Employee's obligations under this Agreement, orally and/or in writing and/or a copy of this Agreement to any Person that is an employee recruiter or the like; that is an employer or prospective employer of Employee; and any other Person that may engage Employee to provide services or that otherwise may engage with Employee in a New Business Activity. Employee agrees to defend, indemnify and hold all Company Related Persons harmless from any and all claims, costs and damages in any way Arising Out Of the Company or any of its Affiliates providing notice of Employee's obligations under this Agreement and/or a copy of this Agreement to any Person.

      7.5.    Non-Disparagement.  From the effective date of this Agreement and continuing throughout the remainder of the Employment Period and following its termination, regardless of the reason Employee's employment terminates and whether termination is initiated by Employee, the Company or otherwise, Employee shall not, directly or indirectly, make, publish or communicate to any Person or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company, any of its Affiliates, any of their products or services or any of their respective shareholders, directors or officers.  (Please note that this Section 7.5. is not intended, and is not to be interpreted, to restrict or discourage Employee from initiating or pursuing any bona fide complaint or grievance, whether through a discussion with an appropriate Company officer or manager or Human Resource representative, use of one of the complaint procedures maintained by the Company and its Affiliates or, where applicable, through the complaint procedure available under each of the Company's employee benefit plans or through any other available legal process.  This Section 7.5. is also subject to Section 2.4. of this Agreement.)

      7.6.    Further Representation and Warranty.  Employee represents and warrants that, from the beginning of the Employment Period through the effective date of this Agreement, there has been no action or omission by Employee that would have violated any provision of Section 7.1., Section 7.2., Section 7.3., Section 7.4. or Section 7.5. of this Agreement, had this Agreement been in effect at the time of such action or omission.



8. **Miscellaneous.**

8.1. <u>Equitable Remedies</u>.

8.1.1. <u>Acknowledgements by Employee</u>.   Employee represents and warrants that Employee has carefully read and considered and understands all of the provisions of this Agreement, Including the restraints imposed upon Employee.   Employee agrees, without reservation, that each of the restraints contained in this Agreement is necessary for the reasonable protection of Customer relationships and other valuable business relationships and goodwill, Confidential Information and other legitimate interests of the Company Group and that each of those restraints is reasonable in respect to its subject matter and scope, length of time and geographic area.   Further, recognizing that the Company will rely on the foregoing in granting Employee the promotion and salary increase to which reference is made in the Recitals of this Agreement (meaning those paragraphs that fall between the initial paragraph of this Agreement and Section 1. of this Agreement) as well as in continuing to employ Employee and in continuing to grant Employee access to Confidential Information and/or business relationships and goodwill, and intending that the Company should so rely, Employee agrees not to assert, and not to permit to be asserted on Employee's behalf, in any forum, any position inconsistent with any of the foregoing representations, warranties and agreements.

8.1.2. <u>Remedies</u>.  Employee acknowledges and agrees that, in the event of any threatened or actual breach of this Agreement by Employee, the Company and/or one or more of its Affiliates will suffer immediate and irreparable injury not compensable by money damages and for which they will not have an adequate remedy available at law.  Accordingly, Employee agrees that, if the Company or any of its Affiliates institutes an action or proceeding to enforce the provisions of this Agreement, the Company and its Affiliates shall be entitled to obtain, without the posting of any bond or security, such injunctive relief, restraining orders, specific performance and other equitable relief as may be necessary or appropriate to prevent or curtail any such breach, threatened or actual.  Any such equitable relief shall be in addition to, and not in lieu of, any other remedies to which the Company and its Affiliates may be entitled.  Further, Employee agrees with the Company that no breach or claimed breach of this Agreement or of any other agreement between the Company and/or any of its Affiliates, on the one hand, and Employee, on the other, shall relieve Employee of any of Employee's obligations under this Agreement.

8.2. <u>Governing Law; Consent to Jurisdiction; Limitation Period</u>.

8.2.1. <u>Governing Law</u>.   THIS AGREEMENT SHALL BE GOVERNED BY, AND INTERPRETED, CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT, WITHOUT REGARD TO THE CONFLICT-OF-LAWS PRINCIPLES OF CONNECTICUT OR ANY OTHER JURISDICTION.

8.2.2. <u>Consent to Jurisdiction</u>.   EMPLOYEE HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT AND THAT OF THE SUPERIOR COURT OF THE STATE OF CONNECTICUT IN AND FOR HARTFORD COUNTY, CONNECTICUT, FOR ANY ACTION, PROCEEDING OR LITIGATION ARISING OUT OF THIS AGREEMENT, ANY ACTIONS CONTEMPLATED BY THIS AGREEMENT, ANY MATTERS RELATED TO EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR ANY TERMINATION OF SUCH EMPLOYMENT (COLLECTIVELY, **"EMPLOYMENT LITIGATION"**).  EMPLOYEE AGREES NOT TO COMMENCE ANY EMPLOYMENT LITIGATION EXCEPT IN THE AFOREMENTIONED FEDERAL COURT OR, IF JURISDICTION DOES NOT LIE THERE, THEN IN SUCH CONNECTICUT SUPERIOR COURT.  EMPLOYEE FURTHER IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF ANY COURT CHOSEN BY THE COMPANY, IN ITS SOLE DISCRETION, FOR ANY EMPLOYMENT LITIGATION. EMPLOYEE FURTHER AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY U.S. REGISTERED MAIL TO EMPLOYEE SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY EMPLOYMENT LITIGATION BROUGHT AGAINST EMPLOYEE IN ANY COURT.  EMPLOYEE HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY EMPLOYMENT LITIGATION IN THE COURT WHERE EMPLOYMENT LITIGATION IS COMMENCED IN ACCORDANCE WITH THIS SECTION 8.2.2. EMPLOYEE HEREBY IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY COURT WHERE ANY EMPLOYMENT LITIGATION IS BROUGHT, THAT EMPLOYMENT LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM OR RAISE ANY SIMILAR DEFENSE.  **TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EMPLOYEE (I) AGREES THAT ANY TRIAL IN CONNECTION WITH ANY EMPLOYMENT LITIGATION SHALL BE EXCLUSIVELY BEFORE THE COURT WITHOUT A JURY AND (II) WAIVES ANY RIGHT EMPLOYEE MAY OTHERWISE HAVE TO TRIAL BY JURY ARISING OUT OF ANY EMPLOYMENT LITIGATION.**

8.2.3. <u>Limitation of Certain Remedies</u>.  Employee shall not: (a) assert any claim against



any Company Related Person unless within one year after the first occurrence of any event giving rise to such claim Employee provides a notice to the Company that describes in reasonable detail such claim and the event(s) giving rise to such claim (nothing contained in this Agreement, however, shall be interpreted to extend any statute of limitations that is shorter than one year); or (b) commence any Litigation Arising Out Of this Agreement until thirty (30) business days after providing to the Company a written notice that specifies the nature of, and bases for, Employee's proposed action in order that Employee and the Company may attempt to resolve it.

8.2.4.  <u>Expenses of Enforcement</u>.  If any Company Related Person takes any legal action to enforce any provision of this Agreement against Employee and prevails in whole or in any material part, then Employee shall pay promptly such Company Related Person's fees, expenses and costs (Including attorneys' fees and disbursements) Arising Out Of such enforcement.

8.3.  <u>Entire Agreement; Counterparts; Amendment and Waiver; Agreement in the Event of Relocation</u>.

8.3.1.  <u>Entire Agreement; Counterparts; Amendment and Waiver</u>.  This Agreement constitutes the entire agreement between Employee and the Company with respect to the subject matter of this Agreement and supersedes any and all prior and contemporaneous agreements, understandings, negotiations, discussions, representations, presentations, statements and promises, written or oral, express or implied, between Employee and the Company or any Company Related Person with respect to the subject matter of this Agreement, with only the following three exceptions: (a) this Agreement shall not terminate or supersede the Prior Confidentiality Agreements with respect to any claims that the Company or any of its Affiliates has or may have with respect to any breach of the Prior Confidentiality Agreements arising while such Prior Confidentiality Agreement was in effect, whether or not any such claim is known or unknown to the Company or any Company Related Person; (b) this Agreement shall not terminate or supersede any additional obligations of Employee to the Company or any of its Affiliates pursuant to any agreement other than the Prior Confidentiality Agreements with respect to confidential information or the like, or with respect to any restrictions on the activities of Employee, that is in effect on the effective date of this Agreement; and (c) exclusive only of Employee's promotion in title and/or position, this Agreement does not supersede the Letter of Employment.  Further, it is understood and agreed that nothing in this Agreement shall limit any additional obligation of Employee Arising Out Of (i) any legal or regulatory requirements, (ii) any agreements between Employee and the Company or any of its Affiliates (that is, agreements in addition to the Prior Confidentiality Agreements) or (iii) Company policies, in each case Including with respect to confidentiality, ownership of work product, restrictions on the activities of employees during employment or the like.  For the avoidance of doubt, all agreements with the Company and all Company policies, Including this Agreement, the Letter of Employment, the Prior Confidentiality Agreements and any other agreement and obligation referenced or referred to in this Section 8.3.1., shall be interpreted and enforced subject to Section 2.4. of this Agreement.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.  No handwritten addition to, deletion from or notation on this Agreement shall be of any force or effect, whether or not initialed or signed.  This Agreement may be amended only by written agreement signed by Employee and an Authorized Officer.  The provisions and conditions of this Agreement and any breaches of this Agreement can only be waived or released in writing, signed by the party to be bound, which, in the case of a waiver or release by the Company, may only be done by an Authorized Officer.  Employee's obligations under this Agreement are independent of any obligations, contractual or otherwise, that the Company has to Employee.  The waiver or release of any breach shall not be deemed to be a waiver or release of any other breach (Including similar or related subsequent breaches) or a waiver or release of any provision or condition of this Agreement.

8.3.2.  <u>Agreement in the Event of Relocation</u>.  In the event that Employee decides to relocate his/her/their residence or seeks Company approval to relocate his/her/their workplace to a state or jurisdiction other than that in which Employee resided or worked on the effective date of this Agreement (the **"New Location"**), Employee (a) shall give the Company not less than sixty (60) business days' prior written notice of intent to relocate Employee's residence and/or desire to relocate Employee's workplace to the New Location and (b) provided that the Company determines that it is willing to continue Employee's employment in the New Location, Employee, at the Company's request, shall enter into such amendment or amendment and restatement of this Agreement as the Company shall determine with such provisions and conditions as the Company also shall determine.  All determinations and requests by the Company under this Section 8.3.2. shall be in its sole discretion.

8.4.  <u>Severability</u>.  The provisions of this Agreement are severable and, if any provision is

declared illegal or unenforceable by a court of competent jurisdiction, such illegality or unenforceability shall not affect the enforceability of any other provision; nor shall such illegality or unenforceability affect the application of the provision in circumstances other than those as to which it is declared illegal or unenforceable.  In addition, if any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable as drafted by virtue of the nature or scope of restricted activities, temporal duration or geographic area thereof or otherwise, then such provision shall be construed in a manner to effectuate the purposes of such provision to the maximum extent enforceable.

8.5.    <u>Rules of Interpretation</u>.  All headings in this Agreement are provided for convenience of reference only.  The headings are not part of this Agreement and are not to be considered in the interpretation of this Agreement or any of its provisions or conditions.  No provision or condition of this Agreement shall be interpreted against or in favor of either of the parties by reason of the extent to which either such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision or condition is inconsistent with any prior draft or any other agreement.  Unless expressly provided to the contrary elsewhere in this Agreement: (a) the Company's rights Arising Out Of this Agreement are continuing rights and may be exercised at any time and from time to time; (b) each obligation of Employee Arising Out Of this Agreement is cumulative with all other obligations of Employee; and (c) compliance or non-compliance by Employee with any obligation of Employee Arising Out Of this Agreement shall not limit, waive or release in any way the other obligations of Employee, or the liabilities of Employee, Arising Out Of this Agreement.  All remedies provided for in this Agreement are cumulative with, in addition to and not in lieu of any other remedies available to any Person at law or in equity.  No Company Related Person shall have any liability to Employee for any exercise by a Company Related Person of any of rights Arising Out Of this Agreement.

8.6.    <u>Beneficiaries; Assignment</u>.  This Agreement shall inure to the benefit of and be binding upon Employee and the Company, and each of their respective heirs, executors, administrators, representatives, successors and permitted assigns.  Employee agrees that each Affiliate of the Company is an intended third party beneficiary of this Agreement.  The Company may not make any assignment of this Agreement without the prior written consent of Employee, except that the Company may assign its rights and obligations under this Agreement without Employee's consent to: (a) an Affiliate of the Company if Employee is transferred to employment with such Affiliate; (b) an Affiliate of the Company, or to the surviving entity, if the Company shall hereafter be part of a reorganization, consolidation or merger; or (c) an acquirer in the event of a sale or transfer of all or substantially all of the business or assets of the Company or of any division or line of business of the Company with which Employee is associated.  Employee consents to be bound by the provisions of this Agreement for the benefit of the Company and any Affiliate, successor or permitted assign to whose employ Employee may be transferred, without the necessity that this Agreement be re-signed at the time of such transfer.  Employee shall not, and shall have no right or power to, assign or delegate any of Employee's rights or obligations Arising Out Of this Agreement except with the prior written consent of the Company in its sole discretion signed by an Authorized Officer.  Any attempted assignment or delegation that is not in compliance with this Agreement shall be null and void.

8.7.    <u>Employee Assurances</u>.  In accepting this Agreement, Employee represents and warrants to the Company that Employee has carefully read and understands all of the provisions and conditions of this Agreement; that, in accepting this Agreement, Employee has relied only on the provisions and conditions of this Agreement and those of the Letter of Employment and on no other agreements, understandings, negotiations, discussions, representations, presentations, statements or promises, written or oral, express or implied, between the Company or any other Company Related Person and Employee; that Employee has had a full and sufficient time to consider this Agreement and to seek advice concerning it from legal counsel and any other Persons of Employee's choosing before signing; and that Employee's acceptance of this Agreement is made freely and voluntarily, without reservation, and with the express understanding that the Company intends to fully and vigorously enforce all provisions and conditions of this Agreement.

8.8.    <u>Notices</u>.  Except as may be provided to the contrary elsewhere in this Agreement, each notice, request, approval, consent or authorization that may be given or made Arising Out Of this Agreement must be in writing and shall be effective (a) when delivered in person or (b) when consigned to a reputable national courier service for delivery on the next day or next business day or (c) when deposited in the U.S. mail, postage prepaid, registered or certified, to the last known address of Employee on the books of the Company or, if to the Company, to it at City Place II, 185 Asylum Street, 7th floor, Hartford, Connecticut 06103, attention of the Senior Vice President and Chief People Officer with a copy to the Company at City Place II, 185 Asylum Street, 7th floor, Hartford, Connecticut 06103, attention of the General Counsel or to such other Person or Persons and address



or addresses as the Company may specify to Employee from time to time. Employee shall give the Company at least ten (10) business days' prior notice of any change in Employee's address, specifying the effective date of such change. In addition, any notice by the Company to Employee may be given by the Company by an email to either Employee's Company email address or the personal email address that Employee last provided to the Company. Any such notice by email shall be effective upon sending.

        8.9.    <u>Advice</u>. This Agreement and the Letter of Employment create legally binding obligations. The Company advises Employee to consult a lawyer before signing.

        INTENDING TO BE LEGALLY BOUND, Employee has executed this Agreement under seal, to take effect on the date of Employee's signature.

*kelly Wolfram*
_____
Employee Signature

Kelly wolfram
_____
Employee Name [Please Print]

Employee Tax ID: __354,722,953.00__

Date Signed: __4/15/2024__

ACCEPTED and AGREED:

GUILFORD SPECIALTY GROUP, INC.

By *Elizabeth A. Mourad*
_____
BEE557ECCA344B3...

Name:

Title: __President and CEO__